Argued and submitted October 5, 1992, reversed and remanded with instructions
October 6, reconsideration denied November 24, 1993, petition for review
denied February 1, 1994 (318 Or 351)

# STATE OF OREGON,
## *Appellant,*

*v.*

# DAVID RONALD McINTYRE,
## *Respondent.*

### (91-3087-B-C-1; CA A73614 (Control))

# STATE OF OREGON,
## *Appellant,*

*v.*

# CLAUDIA PROROK PEREIRA,
## *Respondent.*

### (91-3087-A-C-1; CA A73615)
### (Cases Consolidated)

860 P2d 299

Thomas H. Denney, Assistant Attorney General, Salem, argued the cause for appellant. With him on the brief were Charles S. Crookham, Attorney General, and Virginia L. Linder, Solicitor General, Salem.

David A. Hill, Eugene, argued the cause and filed the brief for respondents.

Before Warren, Presiding Judge, and Riggs and Edmonds, Judges.

WARREN, P. J.

Riggs, J., dissenting.

## WARREN, P. J.

In these consolidated cases, the state appeals from an order granting defendants' motions to suppress evidence seized from their residence without a search warrant. ORS 138.060(3). We reverse and remand.

Defendant Pereira's affidavit in support of her motion to suppress showed that defendants lived in a house located near a highway in rural Jackson County. The house is surrounded by a six- to seven-foot tall wooden fence, with a metal gate across the driveway. On September 12, 1991, police received information from a named caller that he saw marijuana plants inside the fence. Detectives Allen and Snow went to the address and, looking from different vantage points outside the fence, were unable to see any marijuana plants, even with the aid of a spotting scope. The next day, they returned to the house with a third detective. Having failed again to see with a spotting scope any marijuana plants, all three officers entered through the metal gate. Allen walked onto the front porch and knocked on the front door while the other two officers waited in the yard. Pereira came out from a back door. As Allen walked toward her, he saw a four-foot-tall marijuana plant growing beside the house. Allen spoke with Pereira, who later signed a consent form allowing the officers to search the house. That search revealed additional evidence of marijuana cultivation.

Defendants were indicted on two counts of manufacture of a controlled substance and two counts of possession of a controlled substance. Before trial, they moved to suppress "all evidence obtained or derived from the warrantless searches and seizures" of Pereira's person and property. The trial court granted the motions.

At the suppression hearing, the only evidence besides Pereira's affidavit was three photographs that depict the fence surrounding the house and the metal gate. The trial court's written order reads:

### "FINDINGS OF FACT

"1.   Claudia Pereira's property is a rural property.

"2.   The property has a tall wooden fence in front of the property with a metal gate crossing the driveway.

"3. Officers did not have probable cause to seek a warrant [to search] Claudia Pereira's residence.

"4. Officers had suspicions that defendant, Claudia Pereira, was growing marijuana at her residence.

"5. The officers opened the gate and walked up to the defendant's residence.

"6. The court did not decide whether no trespassing signs existed on the property.

### "CONCLUSIONS OF LAW

"The officers had suspicions about the defendant[s] and were investigating the manufacture of marijuana. Based on that suspicion, the officers can be distinguished from the general public such as a girl scout person selling cookies or a motorist out of gas. The defendant, by having a fence, is excluding visitors. The officer [*sic*] would have to obtain a warrant in order to go on the curtilage of defendant's property."

From that order, it is apparent that the trial court relied on two theories in making its decision. The first one, which defendants also espouse on appeal, was that the fence surrounding the house, without more, is sufficient as a matter of law to show their desire to exclude others, including police, from intruding on the curtilage of the house. The second theory was that the police may make a warrantless entry into the curtilage for other purposes, but that they need a warrant if the purpose is criminal investigation. Based on the record before us, we conclude that the suppression order cannot be sustained on either theory.

■■  There is no question that the area surrounding defendants' house, enclosed by a fence, is "curtilage" in which defendants enjoy constitutionally protected property and privacy interests. Or Const, Art I, § 9; *State v. Corra*, 88 Or App 339, 341, 745 P2d 786 (1987), *rev den* 305 Or 331 (1988); *State v. Russo*, 68 Or App 760, 763, 683 P2d 163 (1984). Like a dwelling, curtilage is protected from trespass for any reason, by anyone, unless the residents have expressly or impliedly consented to it. *State v. Ohling*, 70 Or App 249, 252, 688 P2d 1384, *rev den* 298 Or 334 (1984); *see also State v. Hitesman/Page*, 113 Or App 356, 833 P2d 306, *rev den* 314 Or 574 (1992).

In *State v. Ohling, supra,* the officers had a warrant to search an undeveloped, wooded area for marijuana plants. They believed, but did not know, that the defendant was in control or possession of that land, because his residence was the closest to that area. The officers knocked at the defendant's front door and, when no one answered, they went to the back of the house, where they discovered marijuana plants. We held that it was proper for the officers to approach the front door and knock, but that it was a trespass for them to go to the back of the house, and that the evidence discovered there should be suppressed:

> "Going to the front door and knocking was not a trespass. Drivers who run out of gas, Girl Scouts selling cookies, and political candidates all go to front doors of residences on a more or less regular basis. Doing so is so common in this society that, unless there are posted warnings, *a fence,* a moat filled with crocodiles, or other evidence of a desire to exclude casual visitors, the person living in the house has impliedly consented to the intrusion. * * * Going to the back of the house is a different matter. Such an action is both less common and less acceptable in our society. There is no implied consent for a stranger to do so." 70 Or App at 253. (Citation omitted; emphasis supplied.)

■ Relying on the emphasized language, defendants argue that the existence of a fence alone, as a matter of law, is sufficient evidence of their desire to exclude casual visitors, and that, therefore, the officers' intrusion into the curtilage was a trespass. The state responds that a fence in and of itself is not sufficient to exclude casual visitors, because it may be erected for any number of reasons, such as to keep children or pets on or off the premises. Both arguments are misfocused. *Ohling* does not stand for the proposition that a fence alone is sufficient as a matter of law to exclude casual visitors. Rather, the thrust of our statement in *Ohling* is that courts must consider all surrounding circumstances, including the existence of a fence, to determine the residents' intent.[1] In this case, *the officers entered through the metal gate across the driveway.* In this society, people may set up a fence with a gate

---

[1] The dissent asserts that we imply "that citizens cannot exclude casual visitors without posted warnings *and* a fence *and* a moat filled with crocodiles." 123 Or App at 443. (Emphasis in original.) The dissent has read into our opinion something that we neither express nor imply.

in the front for a variety of reasons. For example, they may want to deny all public access to their property, except with consent, by always keeping the gate locked or by posting signs indicating that intent, such as "No Trespassing." *See, e.g., State v. Walch,* 99 Or App 180, 182, 781 P2d 406 (1989); *State v. Russo, supra,* 68 Or App at 762. Or, they may want to keep children or pets off their premises or simply to preserve their seclusion, *cf. State v. Dixson/Digby,* 307 Or 195, 211, 766 P2d 1015 (1988), but nonetheless allow casual visitors to walk through the gate and approach the front door.[2]

Except for its finding that the house had a tall wooden fence with a metal gate crossing the driveway, the trial court made no other findings relevant to entry. It is thus unclear how the officers entered the gate, whether it was locked,[3] or whether any signs were posted. Neither is it clear whether the surrounding circumstances evidence defendants' desire to exclude others. *See State v. Carter/Burton,* 54 Or App 852, 856, 636 P2d 460 (1981). Without those findings, we cannot determine the correctness of the trial court's legal conclusions and its rulings. In *State v. Wise,* 305 Or 78, 81, 749 P2d 1179 (1988), the Supreme Court said:

> "It is the task of the trial judge to make findings of historical fact. This means nothing more or less than that the trial judge must evaluate the evidence, resolve conflicts therein, find what happened and set forth (preferably in writing) what the judge finds. Of course, the judge will also set forth the judge's conclusions of law that flow from what the judge may find happened."[4]

In a warrantless search case, the state has the burden to show that the search is legal. Although the state

---

[2] The dissent claims that we endorse a subjective analysis. 123 Or App at 444. The dissent again sets up a straw man argument and then attacks it. Nothing in our opinion supports the dissent's claim.

[3] The state asserted below that the gate was not locked.

[4] In a footnote, the Supreme Court also warned us and trial judges:

"This court mildly implored trial judges to make findings of historical fact as early as *State v. Chinn,* 231 Or 259, 262 n 1, 373 P2d 392 (1962). The Court of Appeals more emphatically put the matter in *State v. Johnson/Imel,* 16 Or App 560, 570, 519 P2d 1053 (1974). These supplications seem to have fallen on deaf ears; henceforth, the Court of Appeals should not hesitate to send cases back to the trial courts for requisite findings of historical fact when trial courts fail in their obligations." 305 Or at 81 n 2.

indicated that it had witnesses ready to testify, the trial court said that it would not pay any attention to what the witnesses might say concerning whether any signs were posted. On remand, the parties must be allowed to present evidence and the trial court must make findings relating to the relevant issues. *See State v. Paulson*, 313 Or 346, 352, 833 P2d 1278 (1992); *State v. Johnson*, 123 Or App 124, 859 P2d 555 (1993); *cf. State v. Parker*, 317 Or 225, 229, 855 P2d 636 (1993); *State v. Lynch*, 119 Or App 97, 100, 849 P2d 556 (1993).

■     The trial court's second rationale for granting the motions to suppress is based on the officers' purpose in entering the curtilage, that is, their investigation of possible criminal activity. We have consistently held that police may approach a residence's front door and knock, even for an investigatory purpose, when the resident has impliedly permitted casual visitors to do the same. *See State v. Hitesman/ Page, supra*, 113 Or App at 359; *State v. White*, 18 Or App 352, 525 P2d 188 (1974). As we said in *State v. Corbett*, 15 Or App 470, 475, 516 P2d 487 (1973), "[c]riminal investigation is as legitimate a societal purpose as is census taking or mail delivery." The trial court's reliance on the officers' investigative purpose was misplaced. *See State v. Ainsworth*, 310 Or 613, 621, 801 P2d 749 (1990).

Defendants also argue that, even if they had impliedly consented to enteries through the gate, Allen exceeded that consent by walking to the back of the house. *State v. Ohling, supra*, 70 Or App at 253; *see also State v. Donahue*, 93 Or App 341, 345, 762 P2d 1022 (1988), *rev den* 307 Or 303 (1989). The answer to that legal question depends on whether the officers saw the plant from the front of the house and whether that was a place where they had a right to be. If the trial court finds that the entry through the metal gate was lawful, it must make findings about whether the plant was visible from that vantage point.[5]

Reversed and remanded for further proceedings not inconsistent with this opinion.

---

[5] The trial court also indicated that Pereira's subsequent consent to search the house could not be upheld under the circumstances. In light of our disposition, the trial court may need to reevaluate that issue. *See State v. Rodriguez*, 317 Or 27, 38, 854 P2d 399 (1993).

**RIGGS, J.,** dissenting.

I agree with the majority that this case is controlled by *State v. Ohling*, 70 Or App 249, 688 P2d 1384, *rev den* 298 Or 334 (1984). However, the majority so distorts *Ohling* that I must dissent.

The majority says that

"*Ohling* does not stand for the proposition that a fence alone is sufficient as a matter of law to exclude casual visitors. Rather, the thrust of our statement in *Ohling* is that courts must consider all surrounding[1] circumstances, including the existence of a fence, to determine the residents' intent." 123 Or App at 440.

The majority does not cite to any page in *Ohling*, because *Ohling* says no such thing. *Ohling* held that

"[g]oing to the front door * * * is so common in this society that, unless there are posted warnings, a fence, a moat filled with crocodiles, or other evidence of a desire to exclude casual visitors, the person living in the house has impliedly consented to the intrusion." 70 Or App at 253.

The majority implies that citizens cannot exclude casual visitors without posted warnings *and* a fence *and* a moat filled with crocodiles. The clear import of *Ohling*, and also of *State v. Dixson/Digby*, 307 Or 195, 211, 766 P2d 1015 (1988), is that *one* measure indicating a desire to exclude others can negate implied consent.

Having suggested that property owners who value privacy must take a number of steps to exclude others, the majority next grafts a new requirement onto *Ohling*: a subjective intent to exclude casual visitors.

"In this society, people may set up a fence with a gate in the front for a variety of reasons. For example, they may want to deny all public access to their property except with consent, by always keeping the gate locked or by posting signs indicating that intent, such as 'No Trespassing.' Or, they may want to keep children or pets off their premises or simply to preserve their seclusion, but nonetheless allow casual visitors to walk through the gate and approach the front door." 123 Or App at 440-41. (Citations omitted.)

---

[1] I assume no pun intended.

Subjective intent plays no role in the *Ohling* analysis. I may fortify my curtilage with sharpened stakes, cauldrons of boiling pitch and a hundred archers holding crossbows. I may do this for the sole purpose of excluding encyclopedia salespersons or in the mistaken belief that I am the Duke of Northumberland. My subjective intent is irrelevant. The only relevant question is whether I maintain my curtilage in such a way as to imply or express consent to casual visits. That is an *objective* test. *See State v. Dixson/Digby, supra*, 307 Or at 211.[2]

Turning to the facts here, we have neither boiling pitch nor crocodiles, but we do have a trial court finding that defendant had a tall wooden fence and a closed metal gate. Under *State v. Dixson/Digby, supra*, that is sufficient evidence of a desire to exclude visitors. 307 Or at 211. I would affirm the trial court.

---

[2] *Dixson/Digby* concerned the preservation of privacy interests in land outside the curtilage of one's house. However, when the question is whether a subjective or objective test applies to a landowner's efforts to exclude casual visitors, no principled distinction can be drawn between *Dixson/Digby* and this case.