Argued and submitted April 25, reversed and remanded in part; otherwise affirmed June 21, 2000

## STATE OF OREGON,
*Respondent,*

*v.*

## RUSSELL ALLEN SOMFLETH,
*Appellant.*

(9606-34373, 9702-31253; CA A100841 (Control), A100842)
(Cases Consolidated)

8 P3d 221

Mary M. Reese, Deputy Public Defender, argued the cause for appellant. With her on the brief was David E. Groom, Public Defender.

Rolf C. Moan, Assistant Attorney General, argued the cause for respondent. With him on the brief were Hardy Myers, Attorney General, and Michael D. Reynolds, Solicitor General.

Before Haselton, Presiding Judge, and Landau and Wollheim, Judges.

HASELTON, P. J.

**HASELTON, P. J.**

Defendant appeals from a judgment of conviction for manufacture of a controlled substance and possession of a controlled substance. ORS 475.992(1), (4).[1] He assigns error to the denial of his motion to suppress evidence. Defendant contends that police officers unlawfully invaded the curtilage of his home before making observations that the officers, in turn, used to obtain defendant's wife's consent to a search that yielded evidence of the crimes. We conclude that the officers unlawfully invaded the curtilage and that they exploited that illegality in obtaining defendant's wife's consent to search. Accordingly, we reverse and remand for a new trial.

Except as specifically noted, the material facts pertaining to the motion to suppress are uncontroverted. Defendant lived in a house in north Portland. The front of the house faced North Michigan Avenue. Behind the house, and detached from it, was a garage that faced the opposite direction, fronting on a public alley that ran parallel to North Michigan Avenue.[2] A chain-link fence, with a gate, separated the backyard from the alley.[3] The configuration of defendant's property is generally illustrated by the following map:

---

[1] The convictions defendant challenges were entered in Multnomah County Circuit Court Case No. 9702-31253. Defendant was also convicted of two counts of attempted possession of a controlled substance, ORS 475.992, in Multnomah County Circuit Court Case No. 9606-34372, which was joined for trial, but he does not challenge those convictions.

[2] Defendant testified that there was a "No Trespassing" sign on the upper left-hand corner of the main garage door facing the alley. Defendant acknowledged, on cross-examination, that that sign was intended to exclude entry from the alleyway into the garage through the main garage door. Although one of the officers who participated in the challenged search testified that there were "no signs of No Trespassing," the trial court did not make any finding as to whether the alleged "No Trespassing" sign existed. Nevertheless, as explained below, see note 8, the sign's existence is immaterial to our analysis and disposition.

[3] One of the officers who participated in the challenged entry and search testified that the fence was "approximately waist-high." However, defendant introduced photos of the site that show a fence that is approximately five feet tall. See Appendix, reproducing photos from defendant's Exhibit 102.

The rear of defendant's property, including the alleyway, fence, gate, path, and garage, is shown in pictures, submitted as defense exhibits, which are reproduced in the Appendix to this opinion.

In the late spring of 1997, an unknown informant told Portland Police Officer Peter McConnell that people were working on cars in defendant's garage "until all hours of the night" and that "they" were on methamphetamine. Several weeks later, at about 11:00 p.m. on the night of July 3, 1997, as McConnell and his partner drove down the alley behind defendant's house, they saw light coming out of the open side door of the garage. They stopped and got out of their car.

The officers walked through the gate in the chain-link fence[4] and proceeded up the path adjacent to the side of the garage. As the officers passed the open side door of the garage, McConnell looked in and saw defendant in the corner of the garage "kneeling down and * * * lighting something beneath a glass flask that * * * had a piece of brown surgical tubing coming out of it." There was smoke or steam coming from around the glass. From what he saw, McConnell believed that defendant was operating a methamphetamine lab.

McConnell knocked on the open door and, when defendant turned around, defendant looked "worried."

---

[4] The officers testified that the gate was open, and defendant testified that it was closed. The trial court found that the gate was open.

The rear of defendant's property, including the alleyway, fence, gate, path, and garage, is shown in pictures, submitted as defense exhibits, which are reproduced in the Appendix to this opinion.

In the late spring of 1997, an unknown informant told Portland Police Officer Peter McConnell that people were working on cars in defendant's garage "until all hours of the night" and that "they" were on methamphetamine. Several weeks later, at about 11:00 p.m. on the night of July 3, 1997, as McConnell and his partner drove down the alley behind defendant's house, they saw light coming out of the open side door of the garage. They stopped and got out of their car.

The officers walked through the gate in the chain-link fence[4] and proceeded up the path adjacent to the side of the garage. As the officers passed the open side door of the garage, McConnell looked in and saw defendant in the corner of the garage "kneeling down and * * * lighting something beneath a glass flask that * * * had a piece of brown surgical tubing coming out of it." There was smoke or steam coming from around the glass. From what he saw, McConnell believed that defendant was operating a methamphetamine lab.

McConnell knocked on the open door and, when defendant turned around, defendant looked "worried."

---

[1] The officers testified that the gate was open, and defendant testified that it was closed. The trial court found that the gate was open.

McConnell asked if he could come in, and defendant refused. Defendant then came outside to speak to McConnell, closing the door behind him. In response to McConnell's questions, defendant said that he had been heating up varnish for antlers. When McConnell suggested that defendant might be operating a methamphetamine lab and asked if he could confirm that the substance in the flask was varnish, defendant refused.

Defendant then said that he needed to use the bathroom, went into the house, and did not return. McConnell, concerned that the garage might explode, called in other officers. Five to 10 minutes after defendant entered the house, McConnell went to the back door of the house and knocked. Defendant's wife answered and told the officers that defendant was not at home. She agreed that the officers could search the house for defendant, but the ensuing search merely confirmed that defendant was gone.

Either during or after the search of the house, McConnell asked defendant's wife for consent to search the garage. She refused, saying that she did not have access to the garage and was afraid that defendant would learn that she had consented. McConnell then told defendant's wife that he believed that there was a methamphetamine laboratory in the garage; that such operations were highly dangerous; and that, if she did not consent, he could obtain a search warrant. Defendant's wife then consented to a search of the garage, which yielded evidence of methamphetamine production.

After being charged with manufacture and possession of a controlled substance, defendant filed a motion to suppress. Defendant argued, *inter alia*, that his wife's consent was not validly given because that consent was "a direct product" of an illegal trespass by the police:

> "In the present case, the alleged consent search was preceded by illegal police conduct. The actions of the Portland police officers in coming to the defendant's garage in the middle of the night, on a stale complaint of noise, leaving the public alleyway, opening the gate to the defendant's chain link fence, and walking up to peer into the side door of the defendant's garage, was a trespass, a violation of the

curtilage, a violation of Article I, Section 9, of the Oregon Constitution."

As support for that argument, defendant invoked, particularly, *State v. Ohling*, 70 Or App 249, 688 P2d 1384, *rev den* 298 Or 334 (1984), for the proposition that there was no implied consent for the officers to invade the curtilage by entering the backyard. Defendant further argued that his wife's consent was the product of exploitation of that prior illegality.

The state responded that that analysis under Article I, section 9, of the Oregon Constitution, was immaterial because the enactment by initiative of Ballot Measure 40 (1996) obviated that analysis—that is, that under section (2) of Ballot Measure 40, the constitutional limitations on searches and seizures under Article I, section 9, were deemed to be no greater than, and coextensive with, federal constitutional limitations. The state further argued that, given that defendant's backyard was adjacent to a public alleyway and that the gate in the back fence was open, defendant had implicitly invited entry into his backyard. Thus, the state asserted, the officers had not unlawfully invaded the curtilage at the time McConnell observed defendant through the open garage side door.

The trial court agreed with the state that Ballot Measure 40 precluded any independent or distinct Oregon constitutional analysis and, consequently, refused to engage in such analysis under the Oregon precedents, including *Ohling*.[5] The court then denied the motion to suppress:

---

[5]   "[DEFENSE COUNSEL]: I believe the correct analysis would be still to start with the Oregon Constitution and —

"THE COURT: No, it is not. No. I just ruled on it. Measure 40 applies. You don't have the Oregon Constitution to protect you.

"[DEFENSE COUNSEL]: Well, I —

"THE COURT: Am I missing something? I mean, Measure 40 is real clear.

"[DEFENSE COUNSEL]: Yeah, what it says is—I don't think it says you don't have any more Oregon constitutional rights. It says nothing broader than the federal Constitution. But we will start with the Oregon Constitution.

"THE COURT: Well, I disagree. Start with the national Constitution."

Approximately 13 months after the suppression hearing, the Oregon Supreme Court invalidated Ballot Measure 40 in its entirety as violating the "separate vote" requirement of Article XVII, section 1, of the Oregon Constitution. *Armatta v. Kitzhaber*, 327 Or 250, 959 P2d 49 (1998).

"[T]he officers, based on the complaint from three weeks earlier about the noise in the garage, and leaving aside the offhand comment that the person was also into meth, had a reason, once they saw someone in the garage or a light which indicated that someone might be there, a reason to stop and do their community police work.

"It seems to me it's the sort of thing we are wanting officers to do. And so it was reasonable and proper for them to do that, to cross the curtilage, if that's the proper term for this kind of border between a public alleyway and the garage detached from a house, that that was the purpose of their entry and the knock on the garage door.

"That being so, they had a right to be where they were and to see what they saw.

"And that being so, either they had probable cause based on what the officers have said here today to believe that there was a working methamphetamine lab at place in the garage which would excuse any need for consent or else, as they did here, more carefully and more methodically, they went to the door and asked for consent and eventually achieved it."

Defendant was subsequently convicted of manufacture and possession of methamphetamine.

On appeal, defendant reiterates his arguments that the officers' entry onto the property was unlawful and that his wife's consent to search was the product of the exploitation of that illegality. Before addressing the substance of those arguments, we briefly dispose of two threshold matters.

■ First, the state argues that defendant did not adequately preserve his argument that evidence of the officers' initial observations through the open garage door should be suppressed. We disagree. Defendant's memorandum in support of suppression and related oral argument clearly challenged the legality of the officers' initial entry onto the property. If defendant is correct, the officers were, necessarily, at an unlawful vantage point when they made their initial observations—and those observations must, consequently, be suppressed.

The issue was clear. The parties had a full and fair opportunity to develop a complete factual record, and the trial court was expressly apprised of the parties' positions. *See Lutz v. State of Oregon,* 130 Or App 278, 287-88, 881 P2d 171 (1994) (Haselton, J., concurring) ("No one was 'sandbagged.' No one is operating under any illusions. * * * To withhold review in such circumstances is to relegate appellate advocacy to mere gamesmanship, in which the inevitable 'sins' of even the most conscientious counsel are visited on their clients."). Defendant adequately preserved his present arguments.

■ Second, defendant suggests that, given the Supreme Court's intervening invalidation of Ballot Measure 40, including section (2), in *Armatta v. Kitzhaber,* 327 Or 250, 959 P2d 49 (1998), we should remand for the trial court to address, in the first instance, the constitutionality of the search under Article I, section 9, of the Oregon Constitution. We decline to remand here because the factual record has been fully developed, the trial court has resolved all factual disputes, and, consequently, the only issues on appeal are purely legal. In such circumstances, where we are fully competent to determine the issues presented on the record and where whatever determination the trial court would make on a putative remand might well spawn a second appeal, "remand may only serve to delay" the ultimate disposition of the case. *Ashley v. Hoyt,* 139 Or App 385, 396, 912 P2d 393 (1996). Consequently, we proceed to the merits.

■ We begin, as do the parties, with *Ohling.* There, officers went to the front door of the defendant's home to serve a warrant to search a nearby area for evidence of marijuana cultivation. When the officers knocked, they could hear a stereo playing, but no one answered. The officers then "went to the back of the house to see if they could find anyone" but "found the marijuana plants instead." *Ohling,* 70 Or App at 252. The defendant was convicted of manufacture of a controlled substance and, on appeal, we considered "whether the officers, obtaining no response at the front door, could go to the back yard looking for one of the residents in order to serve the warrant." *Id.* We concluded that the officers' conduct unlawfully invaded the curtilage of the defendant's home:

"By their actions the officers intruded onto the curtilage of defendant's dwelling. Their action was a trespass unless it was privileged or had defendant's express or implied consent. If it was trespassory, the search violated Art I, section 9 of the Oregon Constitution.

"* * * Neither the warrant nor their status as peace officers gave them any greater right to intrude onto defendant's property than any other stranger would have. Going to the front door and knocking was not a trespass. Drivers who run out of gas, Girl Scouts selling cookies, and political candidates all go to front doors of residences on a more or less regular basis. Doing so is so common in this society that, unless there are posted warnings, a fence, a moat filled with crocodiles, or other evidence of a desire to exclude casual visitors, the person living in the house has impliedly consented to the intrusion. *Going to the back of the house is a different matter. Such an action is both less common and less acceptable in our society. There is no implied consent for a stranger to do so.* '[W]e do not place things of a private nature on our front porches that we may very well entrust to the seclusion of a backyard, patio or deck.' The facts of this case do not show either an express or an implied consent for strangers to go to the back of defendant's house." *Id.* at 252-53 (citations omitted; emphasis added).

*See also State v. Larson*, 159 Or App 34, 41, 977 P2d 1175, *rev den* 329 Or 319 (1999) (officers' entry into "common" backyard of apartment building was unlawful: "[B]ackyards are generally, by nature, more private than areas in the front of a house * * *. The presence of an individual, other than a resident or guest, in the back area peering up at the second-floor windows would offend social and legal norms of behavior.").

*State v. Jackson*, 71 Or App 76, 691 P2d 130 (1984), is similar. There, the officers went to the defendant's home to ask him about possible marijuana cultivation. After they knocked on the front door and received no answer, one of the officers moved off the front porch towards the side yard, calling out, "Is anybody here?" From that vantage point, the officer saw marijuana plants growing in the backyard. The trial court denied the defendant's motion to suppress and we, invoking *Ohling,* reversed. We concluded that, as in *Ohling,* the officer "left an area in which consent to the presence of

strangers is implied" and, thus, made his observations from a unlawful vantage point. *Jackson*, 71 Or App at 79.

Defendant contends that *Ohling* and *Jackson* establish a "front yard only"—or, conversely, "backyards are different"—principle. That is, that, as a general rule, "curtilage is protected from trespass for any reason, by anyone, unless the residents have expressly or impliedly consented to it," *State v. McIntyre/Pereira*, 123 Or App 436, 439, 860 P2d 299 (1993), *rev den* 318 Or 351 (1994), and that, as a matter of law, implied consent does not extend to entry into the backyard. *See, e.g., Ohling*, 70 Or App at 253 ("Going to the back of the house is a different matter."). *Accord State v. Hitesman/Page*, 113 Or App 356, 359, 833 P2d 306, *rev den* 314 Or 574 (1992) ("[A]pproaching a person's front door and knocking is not a trespass, unless the resident has evidenced a desire to exclude casual visitors.").

The state responds, in part, that *Ohling* does not purport to announce an absolute "bright line" limitation—and, indeed, that neither *Ohling, Jackson,* nor any other reported Oregon decision involves a backyard that is adjacent to a public street or alley.[6] The state points particularly to *State v. Glines*, 134 Or App 21, 894 P2d 516, *rev den* 321 Or 512 (1995), as exemplifying a more qualified, circumstantial approach to "implied consent." In *Glines*, the officers went to the defendant's home but, instead of going to the front door, went to a side entry. That entry was visible from the public sidewalk, had a doorbell, and was adjacent to a common driveway that the defendant shared with his next-door neighbor. After the defendant answered and opened the side door, the officers detected the odor of marijuana, which led to a search. The defendant sought to suppress the fruits of the search, arguing that the officers were unlawfully at the side entrance when they smelled the marijuana. The trial court denied suppression, and we affirmed. After reviewing *Ohling* and *Jackson*, we concluded:

"The facts in those cases are readily distinguishable.

"There is no evidence in this case that defendant asserted any privacy interest in the side door or the area

---

[6] Both *Ohling* and *Jackson* arose in rural settings.

around it. Defendant lives in an urban area. The side entry is about eight feet from the front wall of defendant's house. It is adjacent to a common driveway that defendant shares with his neighbor, is visible from the public sidewalk and is equipped with a doorbell. The area in which the side entry is located is not fenced and there is no evidence of any 'No Trespassing' or 'No Solicitors' signs. In other words, there is no objective evidence that defendant manifested an intent to exclude the public from seeking to contact him at the side door. Under those circumstances, we conclude that defendant impliedly permitted casual visitors to contact him at the side door." *Glines*, 134 Or App at 25.

The state contends that *Glines* is closely analogous to this case—that the back of defendant's property reflected the same type of implicit consent that existed in *Glines*. Specifically, the state asserts that this case, like *Glines*, arose in an "urban area"; that defendant's back gate was functionally similar to the side entry in *Glines* in that both were "both visible and accessible from a public thoroughfare" (*viz.*, the sidewalk in *Glines*; the alleyway here); and that, as in *Glines*, defendant here did not sufficiently manifest an intent to exclude so as to dispel any circumstantial inference of implied consent to enter.

The state is correct that *Glines* contradicts any absolute "front yard only" rule. Rather, implicit in *Glines*—and, for that matter, in *Ohling*—is the principle that location ("front yard" vs. "side yard" vs. "backyard") is one of a universe of circumstances to be considered in assessing whether a resident has implicitly consented to an invasion of the curtilage.[7]

■ Our cases have treated location as, in effect, giving rise to rebuttable "presumptions." The fundamental principle, as emphasized in *Ohling*, is that intrusions onto residential curtilage are deemed to be trespasses unless the entry is "privileged or [has] defendant's express or implied consent." 70 Or App at 252. Nevertheless, given prevailing social norms, the homeowner is presumed to have implicitly consented to entry into the front yard to approach the front door.

---

[7] One of the analytic difficulties in this area is that "front yard" and "backyard" are hardly self-defining terms. We use "front yard" or "front door" to refer to what an objective visitor would regard as being the primary entrance to the property.

Conversely, also given prevailing norms, such a presumption of implied consent to enter is not ascribed to other areas of the curtilage. *See Ohling*, 70 Or App at 253 ("Going to the back of the house is a different matter."). Rather, entry onto those areas is presumptively a trespass. *Id.*

Nevertheless, that presumptive treatment is not necessarily conclusive: A homeowner can abrogate the presumption of implied consent to approach the front door by undertaking sufficient steps to exclude casual visitors from the front yard. *See Ohling*, 70 Or App at 253. Conversely, the presumption that other invasions of the curtilage are trespasses can be overcome by evidence that the homeowner has sufficiently implicitly or explicitly invited entry. Thus, in *Glines*, the doorbell on the side entrance, coupled with the facts that that entrance was visible from the public sidewalk and was directly accessible from the common driveway, so strongly evinced an invitation to the public to use that entry—and the defendant's concomitant expectation that that entrance would be so used—that the officers' entry was not a trespass.

Applying that analysis here, the issue reduces to whether the state overcame the presumption that the officers' entry through the open back gate was a trespass. In particular, did other circumstances so evince implied consent to enter the backyard as to overcome that adverse presumption?

We conclude that the officers' warrantless entry through the back gate was unlawful. That holding flows, in turn, from our assessment of three factual elements that are probative of implied consent to entry: (1) the proximity of the public alleyway to defendant's backyard; (2) the fence separating the alley from the backyard; and (3) the open gate and path leading from the gate to defendant's back door.[8]

---

[8] Our analysis of those factors is limited to the residential curtilage context and does not relate to the qualitatively distinct "open fields" analysis developed in *State v. Dixon/Digby*, 307 Or 195, 211-12, 766 P2d 1015 (1988), and its progeny. *See, e.g., State v. Gabbard*, 129 Or App 122, 126-27, 877 P2d 1217, *rev den* 320 Or 131 (1994) (under the "open fields" doctrine, "Article I, section 9, protects a privacy interest in land outside the curtilage of a person's dwelling, if the person manifests an intent to exclude the public by erecting barriers such as fences or signs. * * * Cases considering the requisite showing of intent to exclude visitors from going to

Defendant's backyard is not a "classic" backyard, in the sense of backing onto another house's backyard in a "back-fence neighbor" fashion. Rather, it is immediately visible and accessible to strangers using the adjacent public alleyway. However, the mere visibility and potential accessibility of the backyard cannot by itself establish an implied consent to enter. If that were true, the landowner would be obligated to undertake affirmative measures to preclude entry into any and all accessible areas of the curtilage—and not just the front yard. That would, in effect, invert and ultimately subvert the fundamental principle underlying curtilage law generally and *Ohling* specifically: An incursion of the curtilage is "a trespass *unless* it [is] privileged or [has] defendant's express or implied consent." 70 Or App at 252 (emphasis added); *see also McIntyre/Pereira*, 123 Or App at 439.

The fence between the alleyway and the backyard certainly does not evince implied consent to enter—but, instead, may corroborate the presumption of nonconsent. *Cf. McIntyre/Pereira*, 123 Or App at 439 (in certain circumstances, existence of high fence and gated driveway may not sufficiently manifest owner's desire to exclude visitors from approaching front door of residence). Nevertheless, the state asserts that the existence of the open gate, in combination with the path across the backyard to the back door, was akin to the common driveway and side entrance in *Glines*, and, thus, manifested an implied invitation to enter. We disagree.

Our holding in *Glines* flowed from the combination of two circumstances: *First*, the common driveway that the defendant shared with his neighbor was adjacent to the side entrance. Thus, the defendant had, at least, implicitly consented to strangers—his neighbor's visitors—intruding onto the portion of the curtilage immediately adjacent to that entry. *Second*, the side entrance, with its doorbell, was visible

---

the front door of a house have imposed a more stringent standard than that applied in *Dixon/Digby*.").

We do not consider the alleged "No Trespassing" sign on the main garage door. Even if such a sign existed, defendant acknowledged that it was intended merely to exclude entry into the garage—and, given the sign's supposed location, an objectively reasonable stranger would understand it to refer solely to the garage and not to the backyard generally.

from the public sidewalk in front of the house. A doorbell has only one purpose—to alert the homeowner to a visitor's presence. A doorbell on an entrance visible from a public thoroughfare *can* reasonably be viewed as manifesting the owner's expectation that casual visitors will use that entrance. That is, the presence of a doorbell is not necessarily conclusive of an implied consent to enter, but, in the totality of circumstances, it may be probative of such consent.

Neither of those factors was present here. Although the alleyway was adjacent to defendant's backyard, defendant—unlike the defendant in *Glines*—had not implicitly consented to strangers entering onto his property. There is no evidence that either the side garage door or the back door to defendant's house had doorbells visible from the street, which could implicitly invite entry by manifesting an expectation that casual visitors would use those entrances. To be sure, the open gate and pathway *could* be viewed as inviting entry—but they can just as plausibly be viewed as existing solely to facilitate the homeowner's personal egress and ingress, to and from the garage and the alley. In contrast to a doorbell, which has one essential function, paths and gates can exist for many reasons. *Cf. McIntyre/Pereira*, 123 Or App 440-41 ("In this society, people may set up a fence with a gate in the front for a variety of reasons."). Thus, in the absence of other circumstances, the mere existence of a gate, open or otherwise, and a path traversing a backyard is insufficient to overcome the presumption that entry into the backyard is a trespass.

We conclude that the officers trespassed when they entered defendant's backyard through the gate and, consequently, that their observations through the open garage door were made from an unlawful vantage point. We further conclude—and the state does not dispute—that defendant's wife's consent to search was the product of exploitation of the officers' observations. *See, e.g., State v. Rodriguez*, 317 Or 27, 854 P2d 399 (1993) (generally addressing exploitation); *State v. Williamson*, 307 Or 621, 626, 772 P2d 404 (1989) (suppressing evidence where the defendant's consent to search was obtained, *inter alia*, because officers "were trading on

evidence that they only had by virtue of the unlawful road-block"). Accordingly, evidence of the officers' initial observations, as well as evidence discovered in the ensuing search, should have been suppressed. Because that evidence was central to defendant's convictions for possession of a controlled substance and manufacture of a controlled substance, we reverse and remand for a new trial in Case No. 9702-31253.

Reversed and remanded for new trial in Case No. 9702-31253; otherwise affirmed.

Appendix.