Argued and submitted December 19, 2013, vacated and remanded
October 8, 2014

STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

MICHAEL JAMES COFFMAN,
*Defendant-Appellant.*

Multnomah County Circuit Court
110933990; A150713

337 P3d 898

Neil F. Byl, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Office of Public Defense Services.

Timothy A. Sylwester, Senior Assistant Attorney General, argued the cause for respondent. With him on the brief were Ellen F. Rosenblum, Attorney General, and Anna M. Joyce, Solicitor General.

Before Armstrong, Presiding Judge, and Nakamoto, Judge, and Egan, Judge.

NAKAMOTO, J.

## NAKAMOTO, J.

Defendant appeals a judgment convicting him of unlawful manufacture of marijuana, ORS 475.856, unlawful delivery of marijuana, ORS 475.860(2)(a), and unlawful possession of marijuana, ORS 475.864(2). In a single assignment of error, defendant argues that the trial court should have granted his motion to suppress evidence because officers were trespassing at the time they secured defendant's consent to enter his apartment. We agree with defendant that the officers were trespassing when they obtained his consent to enter and search his apartment, and we vacate and remand for the trial court to consider whether the officers exploited the trespass to obtain defendant's consent and the evidence sought to be suppressed.

We review a trial court's denial of a motion to suppress for legal error. *State v. Mitchele*, 240 Or App 86, 88, 251 P3d 760 (2010). We are bound by the trial court's findings of fact if there is sufficient evidence in the record to support them. *State v. Ehly*, 317 Or 66, 75, 854 P2d 421 (1993). Consistent with that standard, the facts are as follows.

In 2011, Portland police received a complaint of a suspected marijuana-growing operation at a house on Southeast Taggart Street. From the street, the house appears to be a one-story home with a front door and garage. On the right-hand side of the house is a small, waist-high chain link fence with a gate. There was nothing to indicate that there was any residence in the back of the house, and any normal visitor to the house without special knowledge would go to the front door and knock.

However, the Portland police had previously investigated a marijuana-growing operation at that same address in 2008 and had learned that defendant lived in the basement and that the door to his living quarters was located in the backyard. As part of the 2008 investigation, Officer McGuire and another officer had gone to the house and knocked on the front door. The officers were met at the front door by defendant's mother, Hamblin, who gave the officers consent to enter and search the home. After searching the main part of the house, McGuire asked for permission to

search the basement, where defendant lives.[1] There is no access to the basement from inside Hamblin's house; it is only accessible by a lockable exterior door located at the back of the house. Accordingly, the door at the back of the house is the "front door" of defendant's residence; however, the basement door does not have a separate address, door bell, or mailbox.

Initially, Hamblin refused to consent to a search of the basement, but then acquiesced after McGuire told her that he would obtain a search warrant. Before leading the officers to the basement, Hamblin phoned defendant and said something to the effect of "they're coming down." She then led the officers through the house and the garage to the fenced backyard where they met defendant at the basement door. During their search of the basement in 2008, the officers discovered an illegal marijuana-growing operation.

Three years later, when the police received the 2011 complaint of a suspected growing operation at the same house, the investigating officer, Officer Manzella, read McGuire's 2008 police report. McGuire's report stated that he had learned that the only way to get access to defendant's residence was to walk along the side of the house to the backyard. Manzella and McGuire decided to conduct a "knock-and-talk" to investigate defendant and the suspected growing operation at the house. McGuire shared the information that he had learned about the layout of the house in 2008 with Manzella. Thus, based on McGuire's knowledge, the officers knew that the only way to get into the basement was to go into the backyard.

When Manzella and McGuire arrived at the house in 2011, they went directly to the backyard to knock on defendant's apartment door. To get to the door, the officers walked on a path alongside the house, through the closed gate, and into the fenced backyard. The screen door to defendant's apartment entrance was closed, but the main door was ajar. Manzella knocked on the screen door without identifying himself as a police officer. Defendant said, "Come in." From where defendant was sitting in the apartment, he

---

[1] In its factual findings, the trial court said that defendant's residence was "for lack of a better word," an "apartment in the basement."

could not see the officers at the door. Manzella testified that, once the officers were inside, defendant saw that they were police officers and seemed startled, but did not ask them to leave.

The officers asked defendant about his medical-marijuana status to see if he was in compliance. Defendant told the officers about the number of plants he had, and the officers requested his consent to search the apartment, which he granted. Upon searching, the officers found an out-of-compliance marijuana-growing site inside defendant's apartment. Manzella provided defendant with *Miranda* warnings and interviewed him, and defendant made incriminating statements. The state later charged defendant with the above-mentioned crimes.

Before trial, defendant moved to suppress the evidence obtained during the search of his apartment, arguing that his constitutional rights under Article I, section 9, of the Oregon Constitution and the Fourth Amendment to the United States Constitution were violated when the officers entered the backyard without a search warrant or exigent circumstances.

At the suppression hearing, the state argued that the basement door was defendant's "front door" because it was "the primary access point for the occupant of the residence in question." Because the law presumes that a person impliedly consents to the police coming to his or her front door, and because the officers had special knowledge that it was his "front door," the state contended that the officers were not trespassing when they entered the backyard. Alternatively, the state argued that, even if that door is not considered his "front door," and the officers' entry was presumptively a trespass, defendant's behavior (without checking who was at the door, he said "Come in" when the police knocked) demonstrated that he impliedly consented to people entering the backyard to contact him.

In response, defendant, citing *State v. Larson*, 159 Or App 34, 41-42, 977 P2d 1175, *rev den*, 329 Or 318 (1999), argued that the officers' subjective knowledge that defendant's only door was located in the backyard was irrelevant because the test for whether a resident has impliedly

consented to the public approaching the residence is based on what an objective visitor would do. Accordingly, defendant argued, because there was nothing indicating to an objective visitor that he or she could go into the backyard to contact defendant, the officers' entry was a trespass.

Ultimately, the trial court denied defendant's motion to suppress. In explaining its ruling, the court focused on whether there was implied consent for the officers to go into the backyard:

"[I]t's *** an extremely interesting case, given the cases that both sides cite in their motions. It is clear from the law and [*State v. Ohling*, 70 Or App 249, 688 P2d 1384, *rev den*, 298 Or 334 (1984),] that going to the back door of a dwelling is a trespass or a presumptive trespass. And in the absence of an express consent, implied consent or privilege, it's presumptively a trespass that then the State would have to overcome.

"The issue for the Court, really, is *** is there an implied consent in some way. There's certainly not an express consent. There's not a sign that says visitors for [defendant] go to the rear.

"The officers don't possess a privilege that I can see."

The court then concluded that, because of the knowledge of the police officers, which any member of the public who had done business with defendant might also possess, the officers had not trespassed by going into the backyard:

"But the fact of the matter remains that for his residence, the back door is his front door. Although to the average person, there's nothing that would indicate that.

"But the officers in this case are not the average person. They're people with special knowledge, just like any previous visitor to the house, even probably a Girl Scout who [sold cookies] the year before, the next year would probably go straight to the back door and knock on it.

"*****

"[S]o it's hard for me to fault the officers for going straight to the door that they know is his door to his *** residence. I don't know why they would do anything other, really, because their intent is not to talk to his mom but to talk to

him. And when they knocked, he indicated his comfort level with that scenario by yelling, Come in.

"* * * * *

"And under the circumstances of this case, the officers know that * * * the front of the house is not his front door; that his front door is in the back. And so I'm making the distinction that they had knowledge and based on that knowledge, they did what normal people would do; and I've found that the defendant had a comfort level with that, given his response."

The court did not decide the state's alternative position that, even if the officers' entry was presumptively a trespass, defendant's reaction to their knocking on the door indicated his implied consent to people coming to his door, and the state does not renew that argument on appeal.

Following the trial court's ruling on the motion, defendant waived his right to a jury trial, and, after a stipulated facts trial, the court found him guilty of the above-mentioned crimes. Defendant timely appealed, assigning error to the trial court's denial of his motion to suppress.

Article I, section 9, protects "the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search or seizure[.]" Among the privacy interests that are protected by Article I, section 9, a person's home is considered the "quintessential domain protected by the constitutional guarantee against warrantless searches." *State v. Louis*, 296 Or 57, 60, 672 P2d 708 (1983). Article I, section 9, "provides protection not only to an individual's house proper, but also to the area surrounding the house, known as the curtilage." *State v. Russo*, 68 Or App 760, 763, 683 P2d 163 (1984); *see also State v. Baker*, 350 Or 641, 650 n 7, 260 P3d 476 (2011) (explaining that "curtilage" of a home is the land immediately surrounding and associated with a person's residence). Under the Oregon Constitution, a warrantless intrusion onto residential curtilage is presumptively a trespass, unless the entry is privileged or the defendant has given express or implied consent. *State v. Somfleth*, 168 Or App 414, 424, 8 P3d 221 (2000). A trespassory intrusion onto the curtilage of a person's home violates Article I, section 9. *Ohling*, 70 Or App at 252.

The parties do not dispute that, when the officers entered the backyard of the house, they were intruding onto the curtilage of the residence. And, the state does not argue that the officers were privileged to enter the backyard or had defendant's express consent to do so. Rather, as the trial court identified, this case revolves around the legal question whether that intrusion was a trespass or, instead, the officers had implied consent to enter the backyard.

On appeal, defendant contends that, because the test for whether an individual has impliedly consented to the public's entry onto the curtilage of his or her residence is an objective one, the officers' prior, subjective knowledge that his apartment could be accessed only through the backyard is irrelevant to determining if defendant impliedly consented to such an entry. Accordingly, defendant argues, the trial court erred when it relied on that rationale in its ruling on his motion. Further, defendant argues that, applying the correct test, there was no objective indication that defendant had implicitly consented to visitors entering the backyard to access his door, and therefore, the officers' entry was a trespass and violated his right against unlawful searches.[2]

On appeal, the state relies entirely on its argument that the subjective knowledge of the officers provided them with implied consent to enter the backyard to access what they knew to be the only door to defendant's apartment. At oral argument, the state conceded that, if the test for implied consent is based on whether the general public would understand that there was an implicit invitation for them to contact defendant at that door, "then we can't show that there was anything about this *** door that would have reflected to the public that the public was generally invited back there."

Thus boiled down, the precise issue on appeal is whether the trial court erred in concluding that the officers' subjective knowledge that the door in the backyard was the only door to defendant's apartment could be the basis for

---

[2] Though defendant's motion below was based on the Oregon and federal constitutions, on appeal, defendant advances arguments only under the Oregon Constitution.

implied consent to enter the backyard without a warrant. We conclude that the trial court erred.

The state relies on the rule that a resident impliedly consents to members of the public going to his or her front door, so long as the resident has not "manifested an intent to forbid the intrusion of casual visitors onto the property." *State v. Cam*, 255 Or App 1, 6, 296 P3d 578, *modified on recons*, 256 Or App 146, 300 P3d 208, *rev den*, 354 Or 148 (2013) (internal quotation marks omitted). That presumption of implied consent derives from social norms and expectations:

> "Drivers who run out of gas, Girl Scouts selling cookies, and political candidates all go to front doors of residences on a more or less regular basis. Doing so is so common in this society, that, unless there are posted warnings, a fence, a moat filled with crocodiles, or other evidence of a desire to exclude casual visitors, the person living in the house has impliedly consented to the intrusion."

*Ohling*, 70 Or App at 253.

"Conversely, also given prevailing norms, such a presumption of implied consent to enter is not ascribed to other areas of the curtilage." *Somfleth*, 168 Or App at 425; *accord State v. Pierce*, 226 Or App 336, 343, 203 P3d 343 (2009) ("Approaches to points on the property other than a front door * * * are generally not regarded as being approaches to which the occupant has impliedly consented."). Thus, for example, "[g]oing to the back of the house is a different matter. Such an action is both less common and less acceptable in our society. There is no implied consent for a stranger to do so." *Ohling*, 70 Or App at 253. Therefore, "as a general matter, an officer may enter a front yard and knock on a front door, but an officer may not enter a backyard and knock on a back door," *State v. Unger*, 252 Or App 478, 482, 287 P3d 1196 (2012), *rev'd on other grounds*, 356 Or 59, 333 P3d 1009 (2014), unless the resident has manifested a contrary intent, *see Somfleth*, 168 Or App at 425.[3]

---

[3] It is overly simplistic to view this case as one involving the collision of two rules concerning different parts of the curtilage (front doors versus backyards). Although "[o]ur cases have treated location as, in effect, giving rise to rebuttable 'presumptions'" about trespass and consent, we have rejected the argument that

We reject the state's contention that, because the officers knew that defendant's "front door" was in the backyard, the presumption that a resident impliedly consents to the public approaching his or her front door applies in this case. That argument, based on the officers' subjective knowledge that defendant lived in the basement of the home and had a door leading out to the backyard, is inconsistent with our case law.

We have consistently stated that the presumption of implied consent to approach a resident's front door is based on social norms and whether an objective member of the public, *i.e.*, a stranger, would understand there to be an implied invitation to approach the residence. For example, we recognized in *Somfleth* that "[o]ne of the analytic difficulties in this area is that 'front yard' and 'backyard' are hardly self-defining terms," but we clarified that, when we use the term "front yard" or "front door," we are referring "to what an *objective* visitor would regard as being the primary entrance to the property." 168 Or App at 424 n 7 (emphasis added); *see also State v. Hockema*, 264 Or App 625, 631, 333 P3d 1134, *rev pending* (2014) (stating issue as whether the signs and barriers the resident posted "were sufficient to objectively manifest defendant's intention to prohibit all casual visitors from entering the open driveway and approaching defendant's front door"); *Larson*, 159 Or App at 41-42 (explaining that, despite testimony from the defendant's neighbor in an apartment complex that a sign stating "We like you but *not* in our backyard. *Please* KEEP OUT!" was not intended by her to exclude the police, "the test is an objective one and, viewed objectively, the words of the sign did not limit who it was intended to exclude" (emphasis in

___

our cases establish a "front yard only" or, conversely, a "backyards are different" principle. *Somfleth*, 168 Or App at 424. Thus, in *Somfleth*, we rejected the defendant's argument that, as a matter of law, implied consent does not extend to entry into the backyard. *Id.* Rather, we concluded that implicit in our case law "is the principle that location ('front yard' vs. 'side yard' vs. 'backyard') is one of a universe of circumstances to be considered in assessing whether a resident has implicitly consented to an invasion of the curtilage." *Id.* at 424. That is so, because, in any case, a resident can abrogate either presumption (the presumption of implied consent to approach the front door or the presumption that entries into other parts of the curtilage are trespasses) to indicate an intent to exclude, in the case of front door approaches, or to invite, in the case of other approaches. *Id.* at 425.

original; internal quotation marks omitted)); *Ohling*, 70 Or App at 253 (discussing the curtilage presumptions in terms of what is acceptable in society for "strangers" to do when approaching a person's house).

At oral argument, the state argued that, because this case involves a multi-unit dwelling, our decision in *State v. Stafford*, 184 Or App 674, 57 P3d 598 (2002), *rev den*, 335 Or 181 (2003), controls. We stated in *Stafford* that, in multi-unit dwelling cases, "we look to the physical layout of the living units and the residents' use of the area in question" to determine if there was implied consent. *Id.* at 678 (internal quotation marks omitted). The state leans heavily on the phrase "use of the area in question." Because the officers knew that defendant was using the door in the backyard as his "front door," the state argues that, under the *Stafford* rule, defendant's use of the door gave rise to defendant's implied consent to have visitors enter the backyard.

The problem with the state's argument is that *Stafford*, consistently with our other cases, requires application of an objective test when determining implied consent. *See Stafford*, 184 Or App at 678 (listing the objective evidence that demonstrated implied consent to enter through the apartment building door in order to reach the door to an upstairs apartment and explaining that "[t]he residents of the upstairs units neither posted signs nor took any other action to show that they intended to exclude visitors from the stairway"). Accordingly, the fact that the officers knew that defendant was using the back door as his front door does not establish his implied consent absent a showing that an objective visitor, looking at the physical layout of the living units and the residents' use of the area, would also have concluded that he or she was impliedly invited to contact defendant at that door. Thus, the state's theory that the officers' subjective knowledge gave rise to implied consent to enter the backyard is faulty, regardless of whether the house is viewed as a single-unit dwelling or a multi-unit dwelling.

"The state, as the proponent of the evidence, has the burden of proving an implicit invitation to public entry sufficient to overcome the presumption of trespass." *Pierce*, 226 Or App at 345. As noted earlier, the state conceded at oral

argument that, if the test for implied consent is an objective one, that is, whether an objective visitor would have understood that defendant impliedly invited the visitor to enter the backyard to contact defendant, "then we can't show that there was anything about this *** door that would have reflected to the public that the public was generally invited back there." That concession is consistent with the trial court's findings that "any normal visitor to the house *without any special knowledge* would go to the front door and knock" and that, "if they were selling Girl Scout cookies or going door-to-door for donations or something, any normal person would look at the house and go to the front door. There would be nothing to indicate any residence in the back of the house." (Emphasis added.) Accordingly, we conclude that the officers' entry in this case was a trespass and a violation of defendant's right against a warrantless search.

The state's only other argument on appeal is that, even assuming that the officers' entry onto the curtilage was unlawful, the police did not exploit or trade on that illegality to obtain defendant's consent to enter and search his residence, and therefore, the evidence should not be suppressed. However, because the trial court did not reach that issue, we vacate the judgment and remand for the trial court to consider whether the state exploited the trespass. *See State v. Hayes*, 186 Or App 49, 56-57, 61 P3d 960 (2003), *rev den*, 339 Or 230 (2005) (remanding case to the trial court for consideration of exploitation issue).

Vacated and remanded.