Argued and submitted May 22, 2008, at Lakeview High School, Lakeview, reversed and remanded March 4, 2009

## STATE OF OREGON,
*Plaintiff-Respondent,*

*v.*

## ANDREW LEE PIERCE,
*Defendant-Appellant.*

Jackson County Circuit Court
053579FE; A131475

203 P3d 343

David C. Degner, Deputy Public Defender, argued the cause for appellant. With him on the brief was Peter Gartlan, Chief Defender, Legal Services Division, Office of Public Defense Services.

Tiffany Keast, Assistant Attorney General, argued the cause for respondent. With her on the brief were Hardy Myers, Attorney General, and Mary H. Williams, Solicitor General.

Before Brewer, Chief Judge, Edmonds, Landau, Haselton, Armstrong, Wollheim, Schuman, Ortega, Rosenblum, and Sercombe, Judges.

HASELTON, J.

Wollheim, J., dissenting.

## HASELTON, J.

Defendant appeals from his conviction for possession of a controlled substance (marijuana), *former* ORS 475.992 (2003), *renumbered as* ORS 475.840 (2005),[1] assigning error to the denial of his motion to suppress evidence. Defendant contends that a police officer's observations of defendant's possession of marijuana in a residential backyard at 1:00 a.m., and defendant's consequent admissions and consent to search, were the products of a warrantless search that did not fall within any recognized exception to the warrant requirement. We agree and, consequently, reverse and remand.

The material facts are, for purposes of our review, uncontroverted. At about 1:00 a.m. on May 2, 2005, Medford Police Officer Vollrath arrived at the home of defendant's friend, Hammes, in response to a complaint about a noise disturbance. Vollrath parked his police car on the street in front of Hammes's house and, when he got out, he could hear people yelling and screaming behind the house. Vollrath believed that the crime of disorderly conduct was being committed.

A walkway ran from the sidewalk in front of Hammes's house to the front door of the house. However, Vollrath did not go to the front door. Instead, bypassing the front door, Vollrath walked up a 30-foot long driveway, along the side of Hammes's house, to a point just beyond the rear side corner of the house, where a chain link fence and gate ran between the corner of the house and the garage located at the end of the driveway. The configuration of Hammes's property is generally illustrated by the following diagram:

---

[1] *See generally* Or Laws 2005, ch 708.

Two representative photographs, among several submitted as defense exhibits, are reproduced in the appendix to this opinion.

From that vantage point, Vollrath was able to look through the fence into the backyard. Although it was dark and rainy, Vollrath was able to see into the yard because he had a flashlight and because there was a light near the top of the garage. Vollrath saw defendant and Hammes sitting on a stoop in the backyard, and he identified himself as a police officer. Vollrath then saw defendant pull marijuana plants from two cups and attempt to destroy them by submerging them in a mud puddle in Hammes's backyard.

Vollrath and Medford Police Officer Kirkpatrick, who had also arrived, then arrested defendant and advised him of his *Miranda* rights. Kirkpatrick subsequently obtained defendant's consent to search his home, where police found another marijuana plant and other evidence of marijuana cultivation. Defendant admitted that he had grown all three plants.

Defendant moved to suppress all of the evidence, arguing that it arose from an unlawful search of Hammes's backyard.[2] In particular, defendant contended that Vollrath's entry into the side and rear areas of the curtilage of Hammes's house effected a search for purposes of Article I, section 9, of the Oregon Constitution, and that that warrant-less search was unlawful because no exception to the warrant requirement applied.

The state offered two alternative responses. First, the state asserted that Vollrath's entry into the side and rear areas of the residential curtilage was implicitly invited and, thus, was not a "search" for purposes of Article I, section 9, so that his consequent observations of defendant were "plain view" observations from a lawful vantage point. Second, the state asserted that, even if Vollrath's entry to that point did effect a warrantless search, that search was supported by probable cause with respect to disorderly conduct.

_____

[2] It is not disputed that defendant, who was a guest at Hammes's house and was authorized to use Hammes's garage, had a protected privacy interest in the curtilage of Hammes's residence.

The trial court denied the motion to suppress, stating:

> "I do believe [the officers] had probable cause to believe the crime of disorderly conduct was being committed. I think it was pretty loud, when you take into consideration the time and where they—that the officers were able to hear it, as he exited his vehicle and characterized it as yelling and screaming. And I do feel that the officer, under those circumstances. Under normal circumstances I would agree that—probably not justified in going to the rear of the house and looking in the backyard, from the rear of the driveway and looking into the backyard, but under these circumstances, I do find that it was reasonable and justified for the officers to do so. And I am not exact—it is interesting the characterization of exigent circumstances, but I don't know how to deal with that, but I am just making a finding that what they did was reasonable, and they were justified in doing it, and justified in being where they were."[3]

Following the denial of suppression, defendant entered a conditional plea, pursuant to ORS 135.335(3), to possession of a controlled substance (marijuana).

On appeal, defendant essentially reiterates his position before the trial court. However, the state no longer contends that Vollrath's invasion of the side and rear areas of the residential curtilage and concomitant observations did not constitute a warrantless search for purposes of Article I, section 9. Indeed, in its brief as respondent, the state concedes that,

> "in light of the layout of the property at issue [as depicted in the photographic exhibits], and pursuant to *State v. Somfleth*, 168 Or App 414, 8 P3d 221 (2000), Officer Vollrath conducted a search when he walked up the driveway of the house."

Rather, the state argues solely that Vollrath's warrantless invasion and observations were justified by probable cause

---

[3] It is unclear from the trial court's remarks whether the court denied suppression based on the state's probable cause rationale, the "no search/'plain view'" rationale, or both. Thus, it is unclear whether the trial court endorsed the latter rationale—which is the sole basis of the dissent here and which, as explained immediately below, the state has explicitly disavowed as an alternative basis for affirmance.

and exigent circumstances. Given the state's position on appeal and the ambiguity of the trial court's rationale for denying suppression, *see* 226 Or App at 340 n 3, we begin by addressing the state's "exigent circumstances" contention.

The state contends that Vollrath had probable cause to believe that the crime of disorderly conduct was being committed in the backyard and that there was a constitutionally cognizable exigency either because Vollrath needed to terminate a continuing crime of disorderly conduct or because Vollrath believed that the noise from the backyard could indicate that people were "having a disagreement" that presented the danger of someone being injured. In the latter regard, the state invokes the "community caretaking" statute, ORS 133.033, which permits an officer to enter "upon the premises of another if it reasonably appears to be necessary" in order to "[p]revent serious harm to any person" or to "[r]ender aid to injured or ill persons[.]" ORS 133.033(2)(a)(A), (B). Neither of those justifications is availing.[4]

In *State v. Stevens*, 311 Or 119, 126, 806 P2d 92 (1991), the court generally described the scope of the "exigent circumstance" exception: "An exigent circumstance is a situation that requires the police to act swiftly to prevent danger to life or serious damage to property, or to forestall a suspect's escape or the destruction of evidence." Here, as defendant asserts, the crime of disorderly conduct—based merely on people loudly "having an argument" in the middle of the night—did not require "the police to act swiftly to prevent danger to life or serious damage to property, or to forestall a suspect's escape or the destruction of evidence." *Id.* To be sure, defendant's conduct may have irritated Hammes's neighbors and disturbed their sleep, but it did not rise to the level of a constitutionally cognizable "exigency."

---

[4] The state no longer argues, as it did before the trial court, that the operative exigency was to prevent destruction of the marijuana plants. The state's choice in that regard is well advised—given that Vollrath's observation of the plants occurred after his entry onto the curtilage, that observation cannot be "bootstrapped" into providing the necessary justification for the entry itself.

■    The state's "emergency aid"-based argument is similarly unavailing.[5] In *State v. Follett*, 115 Or App 672, 680, 840 P2d 1298 (1992), *rev den*, 317 Or 163 (1993), we described the elements of the "Emergency Aid Doctrine" as follows:

> "(1)   The police must have reasonable grounds to believe that there is an emergency and an immediate need for their assistance for the protection of life.
>
> "(2)   The emergency must be a true emergency—the officer's good faith belief alone is insufficient.
>
> "(3)   The search must not be primarily motivated by an intent to arrest or to seize evidence.
>
> "(4)   The officer must reasonably suspect that the area or place to be searched is associated with the emergency and that, by making a warrantless entry, the officer will discover something that will alleviate the emergency."

(Footnote omitted.)

Again, the record here is devoid of any evidence that either of the officers responding to the noise complaint had a good faith belief—let alone reasonable grounds to believe— that the noise from the residential backyard indicated "an immediate need for their assistance for the protection of life." *Id.* Indeed, the testimony of both Vollrath and the other officer confirms that they were investigating the crime of disorderly conduct—and not that they were attempting to render emergency aid. *See generally State v. Salisbury*, 223 Or App 516, 524-25, 196 P3d 1017 (2008) (officers heard yelling and screaming within the curtilage of an apartment consistent with a "domestic quarrel," but that did not indicate that violence was occurring and did not justify entry under "emergency aid doctrine").

In sum, regardless of the existence of probable cause, Vollrath's warrantless invasion of the side and rear areas of the residential curtilage was not justified by any exigency.

---

[5] As we have noted, ORS 133.033 does not provide a constitutional exception to the warrant requirement; rather, if the requirements of that statute are satisfied, then it is possible that the "emergency aid doctrine" constitutional exception to the warrant requirement has also been satisfied. *State v. Martin*, 222 Or App 138, 146, 193 P3d 993 (2008); *see also State v. Salisbury*, 223 Or App 516, 523, 196 P3d 1017 (2008).

Further—and the state does not contend otherwise— Vollrath's observations, and defendant's statements and consent to search following those observations, were the unattenuated product of that predicate warrantless intrusion. *See generally State v. Hall*, 339 Or 7, 115 P3d 908 (2005).

■    The dissent contends, however, that the trial court's ruling should nevertheless be affirmed on an alternative ground, *viz.*, that Vollrath's warrantless invasion and consequent observations did not constitute a "search" for purposes of Article I, section 9. As noted, the state has expressly abandoned, and conceded, that matter on appeal. *See* 226 Or App at 340. Of course, a respondent's concession of law is not binding on us. But, here, it is revealing—and correct.

■■    A search, for purposes of Article I, section 9, occurs when "a person's privacy interests are invaded." *State v. Owens*, 302 Or 196, 206, 729 P2d 524 (1986). No search occurs, however, when police officers make observations from a "lawful vantage point." *State v. Ainsworth*, 310 Or 613, 617, 801 P2d 749 (1990). A "lawful vantage point" may be within the curtilage of a property in which a defendant has a privacy interest, given that, "absent evidence of an intent to exclude, an occupant impliedly consents to people walking to the front door and knocking on it, because of social and legal norms of behavior." *State v. Portrey*, 134 Or App 460, 464, 896 P2d 7 (1995).

■    Approaches to points on the property other than a front door, however, are generally not regarded as being approaches to which the occupant has implicitly consented. *State v. Ohling*, 70 Or App 249, 688 P2d 1384, *rev den*, 298 Or 334 (1984), is exemplary. In *Ohling*, officers went to the front door of the defendant's home to serve a warrant to search a nearby area for evidence of marijuana cultivation. When the officers knocked, they could hear a stereo playing, but no one answered. *Id.* at 251-52. The officers then "went to the back of the house to see if they could find anyone" but "found the marijuana plants instead." *Id.* at 252. We reversed the defendant's consequent conviction for manufacture of a controlled substance, concluding that the officers' conduct unlawfully invaded the curtilage of the defendant's home:

"Neither the warrant nor their status as peace officers gave them any greater right to intrude onto defendant's property than any other stranger would have. Going to the front door and knocking was not a trespass. Drivers who run out of gas, Girl Scouts selling cookies, and political candidates all go to front doors of residences on a more or less regular basis. Doing so is so common in this society that, unless there are posted warnings, a fence, a moat filled with crocodiles, or other evidence of a desire to exclude casual visitors, the person living in the house has impliedly consented to the intrusion. *Going to the back of the house is a different matter. Such an action is both less common and less acceptable in our society. There is no implied consent for a stranger to do so.* '[W]e do not place things of a private nature on our front porches that we may very well entrust to the seclusion of a backyard, patio or deck.' The facts of this case do not show either an express or an implied consent for strangers to go to the back of defendant's house."

*Id.* at 253 (citations omitted; emphasis added; brackets in *Ohling*); *see also State v. Glines*, 134 Or App 21, 23-25, 894 P2d 516, *rev den*, 321 Or 512 (1995) (concluding that police had not unlawfully invaded curtilage where the officers went to the defendant's home but, instead of going to the front door, went to a side entry that was visible from the public sidewalk, had a doorbell, and was adjacent to a common driveway that the defendant shared with his next-door neighbor).

■      In *State v. Somfleth*, 168 Or App 414, 424-25, 8 P3d 221 (2000), after reviewing *Ohling* and *Glines* at length, we reiterated and amplified the controlling inquiry:

"Our cases have treated location as, in effect, giving rise to rebuttable 'presumptions.' The fundamental principle, as emphasized in *Ohling*, is that intrusions onto residential curtilage are deemed to be trespasses unless the entry is 'privileged or [has] defendant's express or implied consent.' 70 Or App at 252. Nevertheless, given prevailing social norms, the homeowner is presumed to have implicitly consented to entry into the front yard to approach the front door. *Conversely, also given prevailing norms, such a presumption of implied consent to enter is not ascribed to other areas of the curtilage. See Ohling*, 70 Or App at 253 ('Going to the back of the house is a different matter.'). *Rather, entry onto those areas is presumptively a trespass. Id.*

"Nevertheless, that presumptive treatment is not necessarily conclusive: A homeowner can abrogate the presumption of implied consent to approach the front door by undertaking sufficient steps to exclude casual visitors from the front yard. *See Ohling,* 70 Or App at 253. *Conversely, the presumption that other invasions of the curtilage are trespasses can be overcome by evidence that the homeowner has sufficiently implicitly or explicitly invited entry.* Thus, in *Glines,* the doorbell on the side entrance, coupled with the facts that that entrance was visible from the public sidewalk and was directly accessible from the common driveway, so strongly evinced an invitation to the public to use that entry—and the defendant's concomitant expectation that that entrance would be so used—that the officers' entry was not a trespass.

"*Applying that analysis here, the issue reduces to whether the state overcame the presumption that the officers' entry through the open back gate was a trespass. In particular, did other circumstances so evince implied consent to enter the backyard as to overcome that adverse presumption?*"

(Emphasis added; brackets in *Somfleth.*) The state, as proponent of the evidence, has the burden of proving an implicit invitation to public entry sufficient to overcome the presumption of trespass.

The dissent at least implicitly acknowledges that construct, *see* 226 Or App at 352-53 (Wollheim, J., dissenting), and concludes that the combination of two circumstances (although neither alone would be sufficient) evinced the requisite "implied invitation" here. First, "the driveway provided an unobstructed pathway to the rear of the house." *Id.* at 357 (Wollheim, J., dissenting). Second, defendant and Hammes were making unreasonable noise, engaging in disorderly conduct, in the backyard of the house at 1:00 a.m. *Id.* at 356-57 (Wollheim, J., dissenting).

With respect to the "layout" of the property, it is undisputed that, to reach the point from which he made his observations, Vollrath had to walk up the driveway (which was not a shared driveway, as in *Glines*), bypassing the front door of the residence and traversing the entire width or side of the house to reach the gate between the side of the house

and the standalone garage from which he made his observations. Further, from the photo exhibits in this record, there is no reason to believe that, given its juxtaposition between the house and the garage, the gate was visible from the street—much less inviting entry to that point—at 1:00 a.m. on a rainy night. Certainly, there was no structural feature akin to the doorbell on the side entrance in *Glines*, *see* 134 Or App at 23-25, that manifested such an intent. Finally, it is undisputed that, at the time of Vollrath's entry, a car was parked in front of the garage at the end of the driveway—further contradicting any implication of an "invitation" to enter to that point.

Thus, the purported invitation to enter depends on the proposition that the homeowner, Hammes, by engaging in disorderly conduct in his backyard—or, presumably, by permitting defendant to engage in such conduct—implicitly invited the police to enter. In that regard, the dissent posits that it would not "offend social norms of behavior" in such circumstances for a member of the public to walk up the driveway alongside the home to ask defendant to quiet down and, thus, that defendant manifested, through his conduct, an implied invitation of public entry. 226 Or App at 357-58 (Wollheim, J., dissenting).

With respect, the upshot of the dissent's analysis is that, if a person engages in sufficiently "publicly" obnoxious behavior within the residential curtilage—at any time of the day or night—that conduct effectively waives constitutional protections against warrantless trespassory invasions. The urban homeowner, sitting on the patio, listening to a ball game with the volume turned up so loud as to disturb his neighbors' Sunday afternoon peace, the suburban homeowner doing work in her backyard with exceedingly and irritatingly noisy power tools, the kids in the would-be band "practicing" in the backyard at 8:00 p.m. on a summer Saturday evening—all (in the dissent's view) have invited entry by strangers, including warrantless entry by police officers.

Such an approach, unsupported by Oregon precedent, would qualitatively subvert bedrock constitutional principles that rigorously protect the residential curtilage

from warrantless, uninvited intrusions. *See generally State v. Dixson/Digby*, 87 Or App 1, 6-7, 740 P2d 1224 (1987), *rev'd on other grounds*, 307 Or 195, 766 P2d 1015 (1988) (addressing constitutional underpinnings of protection of curtilage in context of addressing "open fields" doctrine).[6] *See also Payton v. New York*, 445 US 573, 601, 100 S Ct 1371, 63 L Ed 2d 639 (1980) (emphasizing, for purposes of Fourth Amendment analysis, "the overriding respect for the sanctity of the home that has been embedded in our traditions since the origins of the Republic").

■ At base, the dissent misapprehends the meaning and function of implied "invitation" as a qualification of those fundamental constitutional protections. As consistently employed in our case law, "invitation" connotes a manifestation, either by custom or conduct, of the property owner's anticipatory *consent* to entry by members of the public to that point of the curtilage. *See, e.g., Somfleth*, 168 Or App at 425 (framing dispositive issue: "[D]id other circumstances so evince implied consent to enter the backyard as to overcome [the] presumption" that invasion of the backyard is a trespass?); *Ohling*, 70 Or App at 252 (officers' entry "was a trespass unless it was privileged or had [the] defendant's express or implied consent").

■ Thus, "invitation" is a function of consent: Would a member of the public reasonably understand, in the totality of the circumstances, that the property owner has consented, by custom or conduct, to the entry onto the curtilage to that point? Or, more particularly here, would a member of the public reasonably understand that the property owner has so

---

[6] In *Dixson/Digby*, the Supreme Court generally endorsed this court's plurality en banc conclusion that the protections of Article I, section 9, extended to certain lands outside the residential curtilage but reversed our application of those principles to the particular circumstances presented. 307 Or at 211-12. Our en banc lead opinion, authored by Judge Young, quoted with approval the following statement by the Earl of Chatham (William Pitt the Elder):

"'The poorest man may, in his cottage, bid defiance to all the forces of the Crown. It may be frail; its roof may shake; the wind may blow through it; the storm may enter; the rain may enter; but the king of England may not enter; all his force dares not cross the threshold of the ruined tenement.'"

*Dixson/Digby*, 87 Or App at 7 (quoting the Earl of Chatham's statement as quoted in Thomas M. Cooley, *A Treatise on the Constitutional Limitations* 299 n 3 (1868)).

manifested such consent as to overcome the presumption that entry into the "nonfront" areas of the curtilage is a trespass?

The dissent erroneously conflates consent—the constitutional prerequisite to entry—with notions of reasonable foreseeability.[7] If a homeowner is playing music (or listening to a ball game, or using power tools, or yelling) too loudly in the backyard, it may be reasonably foreseeable that irate neighbors may enter to confront the homeowner. But the homeowner has not, even implicitly, manifested consent to

---

[7] As support for its position, the dissent particularly invokes *State v. Wacker*, 317 Or 419, 425-26, 856 P2d 1029 (1993), especially emphasizing *Wacker*'s internal quotation from *State v. Louis*, 296 Or 57, 61, 672 P2d 708 (1983), that "[o]ne would not, for instance, expect police to obtain a search warrant to charge violation of a noise ordinance against sounds emanating from private premises." *See* 226 Or App at 352, 358 (Wollheim, J., dissenting). With respect, that reference in both cases is inapposite to this circumstance.

Neither *Wacker* nor *Louis* involved any physical invasion of the residential curtilage. Rather, *Wacker* involved the admissibility of observations of conduct within a car, and *Louis* addressed whether evidence obtained without a warrant from a vantage point *outside the residential curtilage* should be suppressed. *See Wacker*, 317 Or at 421 (officers, while stationed on second floor of a tavern, used a "starlight scope" to observe drug-related activity in a parked car in tavern's parking lot late at night); *Louis*, 296 Or at 59 (officer, while located in the defendant's neighbor's garage, took photographs, using a telephoto lens, of the defendant exposing himself in the living room of his residence).

Further, with respect to *Louis*'s "noise ordinance" reference, the dissent's emphasized invocation of that language does not acknowledge its proper context:

"Nevertheless, not everything that police officers see or hear one do in private quarters requires a search warrant. The question is when observation (or listening) becomes a 'search' within the legal meaning of that term. Persons may conduct themselves in otherwise protected areas in such a way that their words or acts can plainly be seen or heard outside without any special effort. One would not, for instance, expect police to obtain a search warrant to charge violation of a noise ordinance against sounds emanating from private premises. An indecent exposure in a window opening to public view is not very different. This, we think, is all that can properly be meant by the phrase that a person's conduct within private premises may be such as to sacrifice the 'expectation of privacy.'"

*Louis*, 296 Or at 61. Thus, in *Louis*, the "sound ordinance" hypothetical refers to the admissibility of evidence of a crime that was within the public's perception from outside the residential curtilage. Nothing in *Louis*—or *Wacker*—suggests that, based on such publicly perceptible information, the police can, in the absence of a legally sufficient exigency, invade the curtilage without a warrant to further investigate or to effect an arrest. Indeed, the implication of the dissent's reasoning in this case is that the police, without a warrant, could simply have entered Mr. Louis's home to arrest him because his criminal conduct, albeit within the residential curtilage, was publicly perceptible.

that entry. Indeed, quite the opposite: The irate neighbors may want to enter, but the homeowner does not want them— or any other stranger—there.

The dissent maintains, nevertheless, that the entry was "invited" by reference to "social and legal norms of behavior." Except in rare instances of communal behavior so common and well established as to be akin to custom—*e.g.*, that a property owner has, in the absence of manifestations of exclusion, presumptively consented to strangers going to the front door—judicial reference to such "norms" is illusory. Are they judicially noticeable? Or do we "know them when we see them"? In all events, even if social and legal norms can be reliably identified, they are not conclusive of the protections afforded under Article I, section 9. *See State v. Campbell*, 306 Or 157, 171, 759 P2d 1040 (1988) ("Social and legal norms cannot govern the scope of the constitutional provision, which itself plays a substantial role in shaping those norms.").

Certainly, the dissent's premise that, under "social norms," a person is privileged to confront a disruptive neighbor, in the neighbor's backyard, in the middle of the night is hardly self-evident. Rather, many, perhaps most, Oregonians might (a) telephone the neighbor; or (b) go to the neighbor's front door and, failing a response, go home; or (c) call the police, who would go to the neighbor's front door, knock loudly, and, failing a response, would either abandon their efforts or obtain a warrant or stop by for a chat with the neighbor the next day. *Cf. Ohling*, 70 Or App at 253 (officers unlawfully went to backyard after receiving no response after knocking on front door: "Although the officers may have had good reason to believe that someone was at defendant's house, they had no more legal right to continue to look for that someone after their knocking proved unproductive than anyone else would have.").[8]

Our point is not to engage the dissent in a " 'tis too; 'tis not" debate over prevailing "norms" to be determined by a majority vote of this court en banc. Rather, it is precisely

---

[8] In this case, of course, Vollrath did not even first attempt to knock on the front door. Indeed, he bypassed the front door and went directly to the rear of the residential curtilage.

because such matters are subject to reasonable dispute, and not consensus, that the circumstances here do not evince implied consent to enter.

Defendant did not, by engaging in disorderly conduct, impliedly consent to a warrantless trespassory invasion of the residential curtilage. The evidence sought to be suppressed was the unattenuated product of the concomitant unlawful search. *See generally Hall*, 339 Or 7. Consequently, the trial court erred in denying defendant's motion to suppress.

Reversed and remanded.

**WOLLHEIM, J.,** dissenting.

If my neighbors make unreasonably loud noises in their backyard at 1:00 a.m.—noises so loud that they awaken me from my slumber—I probably would take the easiest and quickest way to their backyard: walk down their driveway and ask them to quiet down. Under the reasoning of the majority, my actions would be criminal because I would be committing criminal trespass in the second degree.[1] By the majority's reasoning, my only lawful approach would be to go the front door of my neighbors' home and knock on that door. But if my neighbors do not answer the door (because too much noise is coming from the backyard for them to hear me), I may not lawfully venture any further onto their property. And, when I call the police for assistance, the police are also legally limited to only approaching my neighbors' front door. Without a warrant, the police may not venture any further. So the police tell me that they have to leave and I have to tough it out that night because the police cannot walk down the driveway where my neighbors are making unreasonable noise at 1:00 a.m. The majority claims that to decide otherwise would "subvert bedrock constitutional principles." 226 Or App at 346. With respect, I disagree and therefore dissent.

Article I, section 9, of the Oregon Constitution protects an individual's privacy interests against unreasonable

---

[1] ORS 164.245(1) provides that "[a] person commits the crime of criminal trespass in the second degree if the person enters or remains unlawfully * * * in or upon premises."

searches and seizures.[2] A search occurs only where the "police invade a protected privacy interest." *State v. Wacker*, 317 Or 419, 426, 856 P2d 1029 (1993). The relevant privacy interest under Article I, section 9, is "an interest in freedom from particular forms of scrutiny." *State v. Campbell,* 306 Or 157, 170, 759 P2d 1040 (1988). "[I]ndividual freedom from scrutiny is determined by *social and legal norms* of behavior, such as *trespass laws*[.]" *Id.* (emphasis added).[3]

Article I, section 9 jurisprudence consistently relies on social and legal norms. Thus, a "seizure" under Article I, section 9, occurs only when a police "officer engages in conduct significantly beyond that accepted in *ordinary social intercourse.*" *State v. Holmes*, 311 Or 400, 410, 813 P2d 28 (1991) (emphasis added). Similarly, a "search" under Article I, section 9, does not extend to the unaided observations by a police officer from a lawful vantage point because "there is no *generally recognized freedom* from such scrutiny by private individuals." *State v. Ainsworth*, 310 Or 613, 617, 801 P2d 749 (1990) (internal quotation marks omitted; emphasis added).

---

[2] Article I, section 9, provides, in part, that "[n]o law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure[.]"

[3] The majority claims that "social and legal norms * * * are not conclusive of the protections afforded under Article I, section 9." 226 Or App at 349. For support, the majority relies on *Campbell* for the proposition that "[s]ocial and legal norms cannot govern the scope of the constitutional provision." 306 Or at 171. I read *Campbell* differently. The passage cited by the majority is included in a paragraph discussing the scope of a search under Article I, section 9, when the government uses radio transmitters and other new technologies that could not have been foreseen when Article I, section 9, was adopted in 1859. *Id.* For governmental use of those new technologies, the Supreme Court announced that the applicable legal test is "whether the practice, if engaged in wholly at the discretion of the government, will significantly impair 'the people's' freedom from scrutiny." *Id.* As noted, the Supreme Court also stated, as a general rule unrelated to the government's use of new technologies, "freedom from scrutiny is determined by social and legal norms of behavior." *Id.* at 170. Because this case involves *trespass* laws and not the governmental use of new technologies, the majority's reliance on *Campbell* is misplaced.

Furthermore, I do not claim that, within the present context, social and legal norms of behavior would be conclusively determinative of Article I, section 9, rights. My view is that social and legal norms determine the bounds of *implied* consent. Implied consent, in turn, sets a default rule that may be overcome by the *explicit* renunciation of any implied consent.

A police officer may lawfully enter private property so long as that entry does not "significantly impair an individual's interest in freedom from scrutiny." *State v. Dixson / Digby*, 307 Or 195, 211, 766 P2d 1015 (1988). That is an objective test. *Wacker*, 317 Or at 425. The Supreme Court explained:

> " '[N]ot everything that police officers see or hear one do in private quarters requires a search warrant. * * * Persons may conduct themselves in otherwise protected areas in such a way that their words or acts can plainly be seen or heard outside without any special effort. *One would not, for instance, expect police to obtain a search warrant to charge violation of a noise ordinance against sounds emanating from private premises.*' "

*Id*. at 425-26 (quoting *State v. Louis*, 296 Or 57, 61, 672 P2d 708 (1983)) (emphasis added). Unless a police officer may lawfully enter the curtilage, however, a police officer would frequently be unable to determine whom to charge with such a noise violation.

Consistently with that proposition, this court has concluded that police intrusion onto private land significantly impairs an individual's interest in freedom from scrutiny if "a private individual would offend *social and legal norms of behavior* by engaging in the same kind of intrusion." *State v. Portrey*, 134 Or App 460, 464, 896 P2d 7 (1995) (emphasis added). Here, as explained below, where there was probable cause to believe that defendant was engaged in disorderly conduct, the officer's entry onto the unobstructed driveway did not so offend those social and legal norms of behavior. Accordingly, I would conclude that the officer's entry onto the driveway was lawful because it did not significantly impair defendant's constitutional privacy interests.

An officer's intrusion onto the curtilage area surrounding a house significantly impairs a person's constitutional privacy interests only if a resident has not expressly or impliedly consented to that intrusion.[4] *State v. Ohling*, 70 Or

---

[4] Defendant was a guest, and not a resident, at the home. A guest may generally assert the constitutional privacy interests held by the host, although the guest's privacy interests are not as extensive as the privacy interests of the host. *State v. Tanner*, 304 Or 312, 321, 745 P2d 757 (1987).

App 249, 252, 688 P2d 1384, *rev den*, 298 Or 334 (1984). Whether social norms of behavior would be offended by such an intrusion informs our analysis of whether a resident has impliedly consented to that intrusion. This court has established a *rebuttable* presumption that "an occupant impliedly consents to people walking to the front door and knocking on it, *because of social and legal norms of behavior.*" *Portrey*, 134 Or App at 464 (emphasis added); *see also State v. Somfleth*, 168 Or App 414, 424, 8 P3d 221 (2000) (the presumption is based on "prevailing social norms"); *Ohling*, 70 Or App at 253 ("Going to the front door and knocking * * * is so common in this society that * * * the person living in the house has impliedly consented to the intrusion."). "Conversely, also given prevailing social norms, such a presumption of implied consent to enter is not ascribed to other areas of the curtilage." *Somfleth*, 168 Or App at 425.

The presumption of implied consent is limited to visitors who have a defined *purpose*—that is, "the intrusion to which * * * occupant[s] impliedly consent is limited to allowing a person to take reasonable steps to make contact." *State v. Premsingh*, 154 Or App 682, 689, 962 P2d 732 (1998) (internal quotation marks omitted); *see also Portrey*, 134 Or App at 465 (the scope of the presumptive implied consent does not permit a visitor to pick up boots on the front porch for inspection); *State v. Gabbard*, 129 Or App 122, 128, 877 P2d 1217, *rev den*, 320 Or 131 (1994) ("An officer's right to go to the front door of a house is based on implied consent to allow visitors to take reasonable steps to make contact with the occupant."). The motivation for making contact is not relevant; accordingly, a police officer may also seek to make contact with a resident even when motivated by criminal investigatory aims. *State v. McIntyre/Pereira*, 123 Or App 436, 442, 860 P2d 299 (1993), *rev den*, 318 Or 351 (1994).

The purpose to make contact with a resident is central to whether a presumption regarding implied consent is rebutted. For example, the public presumptively may enter privately owned lands beyond the curtilage area surrounding a home. *Dixson/Digby*, 307 Or at 211. By posting a "no hunting" sign, a property owner rebuts that presumption as to members of the public having the purpose of hunting there

but does not rebut that presumption as to members of the public having the purpose to camp or hike there. *Id.* at 212.

Similarly, this court has determined that "no trespassing" signs may be "inadequate to exclude visitors who would use the driveway to make contact with the occupants of the house." *Gabbard*, 129 Or App at 128. We reasoned that a *"reasonable visitor* could have assumed that [a no 'trespassing'] sign was intended only to exclude those who might put the property to their own uses * * * [but not] to visitors who desired to contact the residents." *Id.* (emphasis added).

Despite the presumption favoring front-door access, "location ('front yard' vs. 'side yard' vs. 'backyard') is [only] one of a universe of circumstances to be considered in assessing whether a resident has implicitly consented to an invasion of the curtilage." *Somfleth*, 168 Or App at 424. Where the universe of circumstances are objectively viewed as "manifesting [a resident's] expectation that casual visitors" would enter upon the portion of the curtilage away from the front door to contact a resident, the presumption of nonconsent is overcome. *Id.* at 427.

In accordance with that standard, this court concluded that a resident had impliedly consented to entries upon residential curtilage to approach a side door where the side door was adjacent to a driveway shared with a neighbor and was equipped with a doorbell visible from the street. *Id.* at 426-27 (discussing *State v. Glines*, 134 Or App 21, 894 P2d 516, *rev den*, 321 Or 512 (1995)). Likewise, where a resident walks toward officers and those officers respond by walking toward the resident but away from the front door of a house, the officers' "decision to go toward [the resident], rather than to the front door, [i]s reasonable." *Gabbard*, 129 Or App at 128-29. Consequently, where a resident manifests by displaying indicia such as doorbells or by conduct that a reasonable visitor may contact the resident on portions of the curtilage away from the front door, the resident impliedly consents to that contact.

Nonetheless, the presumption of nonconsent to access the curtilage away from the front door of a home is not overcome simply because that portion of the curtilage is

visible and accessible to the public.[5] A resident must *manifest* an expectation to being contacted there. A resident is not "obligated to undertake affirmative measures to preclude entry," such as a privacy fence or locked gate, in order to safeguard a privacy interest to one's backyard or the side of one's home. *Somfleth*, 168 Or App at 426. Similarly, a resident cannot manifest an expectation of being contacted in the backyard where no evidence indicates that the resident is likely to be present there. *See, e.g., State v. Jackson*, 71 Or App 76, 79, 691 P2d 130 (1984) (no implied consent to look in the backyard where no evidence "gave the deputies reason to think defendant might be behind the house"); *Ohling*, 70 Or App at 253 (no implied consent to continue looking for a resident in the backyard after knocking on the door proved unproductive[6]); *State v. Russo*, 68 Or App 760, 683 P2d 163 (1984) (no implied consent where a noise disturbance was created by barking dogs).

However, individuals may "sacrifice[ ] any right of privacy by conducting themselves in such a way that their activities could be seen without any special effort." *State v. Rodriguez-Ganegar*, 186 Or App 530, 538, 63 P3d 1225, *rev den*, 335 Or 578 (2003). Accordingly, although an officer typically does not have any right to peer through a crack in an otherwise obstructed window, *State v. Fortmeyer/Palmer*, 178 Or App 485, 491, 37 P3d 223 (2001), when an individual draws the attention of the public by making loud noises late at night, an officer's observations through cracks in the window blinds may be lawful, *Rodriguez-Ganegar*, 186 Or App at 537-38; *see also State v. Castillo-Salgado*, 186 Or App 605, 610-11, 64 P3d 1169, *rev den*, 336 Or 60 (2003) (an officer

---

[5] The majority states that I "erroneously conflate[ ] consent * * * with notions of reasonable foreseeability." 226 Or App at 348. In fact, my analysis recognizes that most reasonably foreseeable intrusions upon residential curtilage lack implied consent. It is for that reason that the concept of "reasonable foreseeability" has not been incorporated into this court's relevant case law. However, because implied consent is predicated upon social norms, every implied invitation must necessarily be reasonably foreseeable. In other words, implied invitation is a small subset of what may be reasonably foreseeable.

[6] The majority observes that, in *Ohling*, "[w]hen the officers knocked, they could hear a stereo playing." 226 Or App at 343. The dissent in *Ohling* suggests that the stereo was playing inside the home. 70 Or App at 254 (Van Hoomissen, J., dissenting). No other evidence indicated that anyone was present in the backyard.

looking through a gap in the blinds when his attention was drawn by movements inside an apartment did not offend social norms).

In sum, where the evidence establishes that a resident's conduct manifests an objective expectation that members of the general public may intrude on the residential curtilage to contact a resident there, the resident has impliedly consented to such intrusions. Because such an intrusion by a private individual is lawful—and does not constitute trespass—an officer so intruding is also acting lawfully. Because any unaided observations by a police officer from a lawful vantage point does not diminish an individual's interest in freedom from scrutiny, an officer's observations under those circumstances do not constitute a search under Article I, section 9.

Here, the trial court concluded that, *under normal circumstances*, the location of the house and the placement of the driveway would not manifest an implied invitation for the officer to enter onto the driveway and walk down it to look into the backyard. However, defendant engaged in unreasonably loud and disruptive behaviors in the backyard of his friend's Medford home at 1:00 a.m., creating noises loud enough for the officers to have heard the noises from the street in front of the house. Specifically, the trial court found that those behaviors were sufficient to establish probable cause to believe that people were engaged in disorderly conduct. Accordingly, the trial court stated, "under *these circumstances*, I do find that it was reasonable and justified for the officers" to so enter the curtilage. (Emphasis added.) The trial court was correct.[7]

By itself, the accessibility of the rear portion of the driveway did not establish an implied invitation for members of the public to so enter the curtilage. But location is only "one of a universe of circumstances to be considered." *Somfleth,* 168 Or App at 424.

---

[7] The majority states that it is "unclear from the trial court's remarks whether the court denied suppression based on the state's probable cause rationale, the 'no search/"plain view"' rationale, or both." 226 Or App at 340 n 3. Regardless of any ambiguity in the trial court's remarks, the trial court was correct in reaching its ultimate conclusion that the officer's intrusion onto the curtilage was lawful.

Defendant's conduct—engaging in disorderly conduct—created a specific context in which it would have been socially acceptable for a private individual to walk down the driveway alongside the house to ask defendant to quiet down. A person commits the crime of disorderly conduct if a person "[m]akes unreasonable noise" and has the intent to cause, or recklessly creates the risk of causing, "public inconvenience, annoyance or alarm." ORS 166.025(1).

The majority denigrates the significance, and misinterprets the statutory meaning, of defendant's disorderly conduct by equating it to mere " 'publicly' obnoxious behavior." 226 Or App at 346. If the offense of disorderly conduct criminalized mere publicly obnoxious behavior, this court would likely find such a statute to be constitutionally defective "because a significant amount of unreasonably obscene, unreasonably insulting, unreasonably shocking, unreasonably offensive, and unreasonably insensitive expression * * * is constitutionally protected." *State v. Rich*, 218 Or App 642, 650, 180 P3d 744 (2008). However, the disorderly conduct statute, ORS 166.025, is not similarly defective. Rather, as this court held, ORS 166.025 is constitutionally permissible as a "classic time, place, or manner law" that restrains conduct based on its "volume, duration, location, and the like" without stifling expression. *Rich*, 218 Or App at 647, 650.

Defendant's conduct invited entry not because defendant was publicly obnoxious but because the volume, duration, place, and time of defendant's conduct established probable cause that he created a risk of public inconvenience, annoyance, or alarm. By engaging in disorderly conduct, defendant sacrificed the presumption that intrusions on the curtilage at the rear of the house are generally intrusions upon a resident's liberty interests. He sacrificed that presumption because, under those circumstances, members of the public would not offend social norms of behavior by entering the residential curtilage to ask defendant to bring his conduct in compliance with the law. By manifesting that a reasonable visitor would seek to contact defendant there, defendant impliedly consented to that entry. Accordingly, members of the public so acting would *not* be committing criminal trespass. Where the driveway provided an unobstructed pathway to the rear of the house, the layout of the

property did nothing to contradict any implied invitation for a member of the public to contact defendant there.[8] Thus, the officer's entry was neither an unlawful trespass nor a significant impairment of defendant's rights under Article I, section 9, of the Oregon Constitution.

As noted above, the Supreme Court would not " 'expect police to obtain a search warrant to charge violation of a noise ordinance against sounds emanating from private premises.' " *Wacker*, 317 Or at 426 (quoting *Louis*, 296 Or at 61). The majority's holding and reasoning would have the opposite practical effect, because under its interpretation of implied consent, a police officer would no longer be able to enter onto the curtilage to identify any particular defendant to charge. The principle of implied consent has never before been treated so narrowly.

The majority substantially narrows the construct of "implied consent" by declaring that invitation must convey "the property owner's anticipatory *consent* to entry by members of the public." 226 Or App at 347 (emphasis in original). Claiming that " 'invitation' is a function of consent," the majority argues that implied consent cannot be found where "the homeowner does not *want* them—or any other stranger—there." 226 Or App at 348-49 (emphasis added). Although the majority claims that this definition of implied consent has been "consistently employed in our case law," 226 Or App at 347, I am unable to discern that definition from the cases cited by the majority.

The majority's proposed definition interjects for the first time a resident's *subjective desire*—whether the resident *wants* someone to enter—as an element of implied consent. This court has never before recognized such a subjective

---

[8] The majority states that a car parked on the driveway contradicts any implication of an invitation to enter to that point. 226 Or App at 346. This court has never before held that a car parked in the driveway, as this car was parked, may negate an implied invitation to intrude. A parked car is not an obstruction that signals an expectation that no one may walk beyond that point. At best, a parked car may indicate that a resident is more likely to be home. Under the circumstances of this case, I do not understand why the court should treat the parked car as a contradiction of any implied invitation to enter. Perhaps if the car was parked in a manner that precluded anyone from walking down the driveway to the end of the house and to the chainlink fence, it would be reasonable to find that the car negated any implied invitation. But that is not this case.

element. *McIntyre/Pereira*, 123 Or App at 444 (Riggs, J., dissenting) ("Subjective intent plays no role in the *Ohling* analysis" regarding implied consent); *id.* at 441 n 2 (majority opinion) ("The dissent claims that we endorse a subjective analysis. * * * Nothing in our opinion supports the dissent's claims.").

Rather, this court has consistently treated that subjective component—akin to whether a person may not *want* magazine salespeople, political canvassers, or even Girls Scouts selling cookies to approach the front doors of their homes during dinnertime—as irrelevant to our analysis of implied consent. *See Ohling*, 70 Or App at 253 (describing similar contacts to which residents are presumed to have impliedly consented). Similarly, most residents do not want and would not have *explicitly* invited police officers to approach their front doors to serve arrest warrants on them. But those subjective desires play no role in determinations of *implied* consent. *See also Wacker*, 317 Or at 425 ("The privacy interests protected from unreasonable searches under Article I, section 9, are defined by *an objective test* of whether the government's conduct would significantly impair an individual's interest in freedom from scrutiny."). (Internal quotation marks omitted; emphasis added.)

In addition, the majority erroneously narrows the definition of implied consent by rejecting most judicial references to social and legal norms. 226 Or App at 349-50. The majority claims that such references are "illusory," "[e]xcept in rare instances of communal behavior so common and well established as to be akin to custom." 226 Or App at 349. The majority proceeds to advise that unless the social acceptability of police intrusions are beyond "reasonable dispute"—that is, adopted by social "consensus"—those intrusions should not evince an implied consent to entry. 226 Or App at 350.

The majority makes those claims without legal citation. No Oregon case indicates that the notion of social *consensus* has ever even been considered—much less adopted—as the standard for ascertaining either the scope of implied consent, in particular, or the reach of Article I, section 9, in general. Within the context of implied consent, for example, the dissent in *McIntyre/Pereira* would have interpreted a tall

wooden fence and a closed metal gate around the curtilage of a home as contradicting any implied consent to enter. 123 Or App at 444 (Riggs, J., dissenting). However, although the dissent's view in that case illustrated a disagreement regarding social norms, the majority remanded the case to the trial court to determine whether, in the totality of the circumstances, the officers nonetheless had implied invitation for their entry. *Id.* at 442. Similarly, no case has analyzed whether *any* member of society would have interpreted a "no hunting" or "no trespassing" sign as a lack of social consensus to enter the curtilage to contact a resident; instead, those cases turn on whether such signs provide the public with "objectively reasonable notice" that their entry was not allowed. *State v. Hitesman/Page*, 113 Or App 356, 361, 833 P2d 306, *rev den*, 314 Or 574 (1992). No social consensus requirement for a determination of social and legal norms has been incorporated into our existing case law, and no such requirement should be adopted.

I agree with the majority's contention that notions of implied consent should not depend on defining prevailing norms "by a majority vote of this court en banc." 226 Or App at 349. The question is not what a majority of the people—or a majority of judges on this court—believe is socially acceptable. The question is what a *reasonable visitor* would have understood. That is the fundamental principle upon which the presumption that a resident impliedly consents to front door access is based. That is the fundamental principle that the legal precedent of this state has consistently abided by. And that is the fundamental principle that the majority departs from in its ruling in this case.

Article I, section 9, protects individual interests from unreasonable scrutiny. The Oregon Supreme Court interprets that interest by reference to social and legal norms of behavior. Governmental intrusions on curtilage to approach the front door of residential homes are permissible because social norms provide that private individuals may take reasonable steps to make contact with residents there. Similarly, when a resident manifests an expectation that private individuals may seek contact on portions of the residential curtilage away from the front door, and such contact would

not offend social and legal norms of behavior, a private individual may do so without violating the law. Under the facts of this case, where defendant engaged in disorderly conduct— by making unreasonable noise that caused public inconvenience, annoyance, or alarm at 1:00 a.m.—it would have been socially acceptable, and legal, for a member of the public to walk down the driveway to ask defendant to quiet down. Because a member of the public could walk down the driveway without engaging in criminal behavior, a police officer so intruding does not violate defendant's Article I, section 9, rights. Consequently, the trial court did not err by denying defendant's motion to suppress.

For those reasons, I respectfully dissent.

Edmonds, Ortega, and Sercombe, JJ., join in this dissent.

# Appendix