Argued and submitted April 12, 2011, reversed and remanded
September 26, 2012, petition for review allowed April 25, 2013 (353 Or 533)

**STATE OF OREGON,**
*Plaintiff-Respondent,*

*v.*

**MARK LAWRENCE UNGER,**
*Defendant-Appellant.*

Marion County Circuit Court
09C42443; A144192

287 P3d 1196

Jason E. Thompson argued the cause for appellant. With him on the brief was Ferder Casebeer French & Thompson, LLP.

Douglas F. Zier, Assistant Attorney General, argued the cause for respondent. With him on the brief were John R. Kroger, Attorney General, and Mary H. Williams, Solicitor General.

Before Armstrong, Presiding Judge, and Haselton, Chief Judge, and Duncan, Judge.

DUNCAN, J.

## DUNCAN, J.

This is a criminal case in which defendant appeals the trial court's judgment convicting him of two counts of manufacture of cocaine, ORS 475.876, and two counts of endangering the welfare of a minor, ORS 163.575. On appeal, defendant assigns error to the trial court's denial of his motion to suppress evidence that police officers discovered after they entered his backyard, knocked on his back door, and obtained his consent to enter and search his house. Defendant argues that the officers' entry into his backyard violated his rights under Article I, section 9, of the Oregon Constitution,[1] and that the violation tainted his consent to the officers' entry into and search of his house. For the reasons explained below, we agree and, therefore, reverse and remand.[2]

We review the trial court's denial of a defendant's motion to suppress for errors of law. *State v. Hall*, 339 Or 7, 10, 115 P3d 908 (2005). We are bound by the trial court's findings of historical fact if they are supported by constitutionally sufficient evidence. *Id.* Stated in accordance with that standard, the relevant facts are as follows.

On the morning of April 17, 2009, four officers went to defendant's residence to conduct a "knock-and-talk." The officers had received two reports of drug activity at the house, and they wanted to talk to defendant about the reports and obtain his consent to a search of his house. The officers did not have a warrant to search the house.

To reach defendant's house, the officers turned off a paved road, drove down a gravel road, and then drove

---

[1] Article I, section 9, of the Oregon Constitution provides:

"No law shall violate the right of the people to be secure in their persons, houses, papers, and effects, against unreasonable search, or seizure; and no warrant shall issue but upon *probable cause, supported by oath, or affirmation,* and particularly describing the place to be searched, and the person or thing to be seized."

[2] Defendant also assigns error to the trial court's denial of his motions for judgments of acquittal. We reject those assignments without discussion. Because we conclude that the court should have granted defendant's motion to supress, we do not reach defendant's other assignments of error.

down a dirt road. Defendant's house is a split-level house. The officers first went to defendant's front door, which is on the same level as the driveway. One officer, Cypert, knocked on defendant's front door, but no one answered. After waiting two to three minutes, two other officers, Jaroch and Scharmota, went to a door on the lower level of the house, also on the front of the house. They knocked, but again no one answered. After that, the fourth officer, Roberts, walked around the back of defendant's house and knocked on a sliding glass door, which led to defendant's bedroom. Defendant, who had been asleep, answered the door. Roberts told defendant that the officers were at his house to investigate the complaints they had received, and Roberts asked for permission to enter the house. Defendant asked to put on a robe and then allowed Roberts and the three other officers, who had joined him at the back door, to enter.

Defendant led the officers from his bedroom, where his girlfriend was still in bed, into his kitchen. Roberts again told defendant that they were investigating complaints about drug activity and asked defendant if he would show them around the house. Defendant did. On the lower level of defendant's house, Roberts saw a torn piece of a baggie, inside of which he saw white powder and some small crystals. Roberts told Cypert that he had found the baggie, and Cypert relayed that information to defendant. Roberts left the house to conduct a field test on the baggie to determine whether, as he believed, it contained methamphetamine residue.

Cypert read defendant a "consent to search" card. Defendant refused to sign the card and said he wanted to call his lawyer. According to Cypert, defendant gave the officers "verbal consent to continue to look through the house," but said "that he would not sign the card because he viewed the card as being a legal document and he would not sign a legal document without first consulting with his attorney." The officers continued to search defendant's house, and defendant called his attorney. After speaking with his attorney, defendant told the officers that "[h]is attorney wanted everyone out of the house." Cypert told defendant that he knew that defendant had spoken with his attorney, but that "it was ultimately up to [defendant] to make [the] decision if he wanted [the officers] out of the

house." Defendant called his attorney a second time and, after the call, told the officers that he wanted them out of the house. At that point, Roberts informed everyone that the baggie had tested positive for methamphetamine, and the officers arrested defendant.

The officers used information they had obtained during their search of the house to obtain a search warrant, which they executed later the same day. The execution of the warrant led to the discovery of other evidence of drug crimes.

Defendant filed a motion to suppress the evidence obtained as a result of the officers' warrantless entry into his yard and search of his house, as well as the evidence obtained as a result of his arrest and the subsequent search of his home pursuant to the warrant. At the hearing on the motion, defendant argued that the officers violated his rights when they entered his backyard and that all evidence derived from the violation had to be suppressed, including the evidence that the officers obtained during their subsequent searches of the house.

In response, the state argued that, even if the trial court found that "the officers went to an illegal location by violating the curtilage and going to the back, they didn't witness anything illegal that drew their attention to the defendant." Therefore, according to the state, "there [was] no exploitation of the illegality."

The trial court denied defendant's motion to suppress. Defendant appeals, and, on appeal, the parties renew the arguments they made in the trial court.

We begin with the basic law. Article I, section 9, protects individuals from unreasonable searches and seizures. A warrantless search or seizure is *per se* unreasonable unless it falls within "one of the few specifically established and well-delineated exceptions to the warrant requirement." *State v. Davis*, 295 Or 227, 237, 666 P2d 802 (1983) (internal quotation marks omitted). In order for the state to secure the admission of evidence resulting from a warrantless search or seizure, the state must prove that the search or seizure was justified by an exception to the warrant requirement. *Id.* Those exceptions are narrowly

drawn. *State v. White,* 211 Or App 210, 214, 154 P3d 124, *adh'd to on recons,* 213 Or App 584, 162 P3d 336, *rev den,* 343 Or 224 (2007).

Consent is an exception to the warrant requirement. *Davis,* 295 Or at 237. An individual's consent to a search or seizure is invalid if it is the product of illegal police conduct. *Hall,* 339 Or at 21; *State v. Pierce,* 226 Or App 336, 350, 203 P3d 343 (2009).

In this case, the officers entered defendant's backyard and, after obtaining defendant's consent, entered and searched his house. For the reasons explained below, we conclude that (1) the officers' entry into defendant's backyard violated defendant's Article I, section 9, rights because it was a search and it was not justified by either a warrant or an exception to the warrant requirement, and (2) the officers' entry into and search of defendant's house also violated Article I, section 9, because, although defendant consented to the entry and search, his consent was invalid because it was the product of illegal police conduct, specifically, the illegal entry into his backyard.

We turn first to the officers' entry into defendant's backyard. As described, the officers went into defendant's backyard and knocked at his back door. Under Oregon law, "intrusions onto residential curtilage are deemed to be trespasses unless the entry is 'privileged or [has the occupant's] express or implied consent.'" *State v. Somfleth,* 168 Or App 414, 424-25, 8 P3d 221 (2000) (quoting *State v. Ohling,* 70 Or App 249, 252, 688 P2d 1384, *rev den,* 298 Or 334 (1984)). "[A]bsent evidence of an intent to exclude, an occupant impliedly consents to people walking to the front door and knocking on it, because of social and legal norms of behavior." *State v. Portrey,* 134 Or App 460, 464, 896 P2d 7 (1995); *see also Ohling,* 70 Or App at 253. However, "[a]pproaches to points * * * other than a front door * * * are generally not regarded as being approaches to which the occupant has implicitly consented." *Pierce,* 226 Or App at 343. Accordingly, we have held that, as a general matter, an officer may enter a front yard and knock on a front door, but an officer may not enter a backyard and knock on a back door. *Ohling,* 70 Or App at 253. Such an entry is a trespass

and constitutes a search for the purposes of Article I, section 9. *Ohling*, 70 Or App at 252.

*Ohling* is illustrative. In *Ohling*, we held that officers trespassed when, after receiving no answer when they knocked at the defendant's front door, they walked around to the back of his house. 70 Or App at 252-53. We explained, "Going to the front door and knocking was not a trespass. * * * Going to the back of the house is a different matter. Such an action is both less common and less acceptable in our society. There is no implied consent for a stranger to do so." *Id*. at 253. Applying that rule, we concluded that the officers trespassed and the trespass violated the defendant's Article I, section 9, rights. *Id*. at 254; *see also Pierce*, 226 Or App at 350 (officer trespassed by bypassing the defendant's front door and walking past the side of the defendant's house to reach defendant's backyard gate); *Somfleth*, 168 Or App at 424-25 (officers trespassed by entering the defendant's backyard); *State v. Larson*, 159 Or App 34, 41-42, 977 P2d 1175, *rev den*, 329 Or 318 (1999) (officers trespassed by entering a "common" backyard of an apartment building); *State v. Jackson*, 71 Or App 76, 79, 691 P2d 130 (1984) (officer trespassed by entering the defendant's side yard).

The facts of this case are indistinguishable from those in *Ohling*, and the state acknowledges as much. Accordingly, we conclude that the officers trespassed when they entered defendant's backyard and knocked on his back door, and the trespass violated defendant's Article I, section 9, rights.

That conclusion leads to the second issue in the case: whether the officers' illegal entry into defendant's backyard invalidated defendant's consent to the officers' entry into and search of his home. Consent that is the product of illegal police conduct is invalid, and evidence obtained as a result of such consent is inadmissible. *Hall*, 339 Or at 36-37. That is because Article I, section 9, which guarantees individuals the right to be free from unreasonable searches and seizures, also guarantees individuals the right to be free from the government's use of evidence obtained as a result of such searches and seizures. *Id*. at 24 ("[T]he right to be free from unreasonable searches and seizures under

Article I, section 9, also encompasses the right to be free from the use of evidence obtained in violation of that state constitutional provision."); *State v. Tanner*, 304 Or 312, 315 n 2, 745 P2d 757 (1987) (individuals have "a constitutional right to exclude evidence obtained in violation of Article I, section 9"). It "bar[s] the government's use of its own invasions of [a] defendant's rights." *Davis*, 295 Or at 233 n 5. That bar is based on the

> "principle that those rules of law designed to protect citizens against unauthorized or illegal searches or seizures of their persons, property, or private effects are to be given effect by denying the state the use of evidence secured in violation of those rules against the persons whose rights were violated, or, in effect, by restoring the parties to their position as if the state's officers had remained within the limits of their authority."

*Id.* at 237. As a result, in determining the admissibility of evidence obtained following a violation of a defendant's Article I, section 9, rights, "the critical inquiry is whether the state obtained the evidence sought to be suppressed as a result of a violation of the defendant's rights under Article I, section 9." *Hall*, 339 Or at 24.

The methodology for determining whether evidence was obtained as a result of illegal police conduct was summarized in *Hall*. First, a defendant must establish "the existence of a minimal factual nexus—that is, at minimum, the existence of a 'but for' relationship—between the evidence sought to be suppressed and prior unlawful police conduct." *Id.* at 25. If the defendant does,

> "the state nevertheless may establish that the disputed evidence is admissible under Article I, section 9, by proving that the evidence did not derive from the preceding illegality. To make that showing, the state must prove that either (1) the police inevitably would have obtained the disputed evidence through lawful procedures even without the violation of the defendant's rights under Article I, section 9; (2) the police obtained the disputed evidence independently of the violation of the defendant's rights under Article I, section 9; or (3) the preceding violation of the defendant's rights under Article I, section 9, has such a tenuous factual link to the disputed evidence that that

unlawful police conduct cannot be viewed properly as the source of that evidence[.]"

*Id.* (citations omitted). Thus, when, as here, a defendant argues that his consent was the product of illegal police conduct, the defendant must establish a minimal factual nexus between the illegal police conduct and his consent. If the defendant does, then the state must prove that the defendant's consent was independent of, or only tenuously related to, the illegal police conduct. As the Supreme Court explained in *Hall,*

> "consent is insufficient to establish the admissibility of evidence from a warrantless search if the state cannot prove that the consent was independent of, or only tenuously related to, any preceding violation of the defendant's rights under Article I, section 9. Unless the state is able to make that showing, then the defendant's consent cannot operate to validate a warrantless search because the defendant's consent *itself* derived from a violation of the defendant's rights under that state constitutional provision. To not require suppression in such circumstances would be inconsistent with the previously described rationale underlying the Oregon exclusionary rule, that is, to place a defendant in the same position as if the governmental officers had acted within the bounds of the law."

339 Or at 27-28 (emphasis in original; citations omitted).

A minimal factual nexus exists between illegal police conduct and a defendant's consent if the illegal police conduct gives the police the opportunity to ask for consent or is ongoing at the time the police ask for consent. For example, in *State v. Ayles*, 348 Or 622, 237 P3d 805 (2010), the Supreme Court held that there was a minimal factual nexus between an officer's illegal seizure of the defendant and the defendant's consent where the seizure was ongoing at the time the consent was given. The court explained:

> "[W]e cannot conclude that the illegal seizure of defendant, while it was ongoing, had no factual nexus to defendant's decision to consent. A defendant gains nothing from having a constitutional right not to be seized if the police can seize him and—by definition—use the circumstances of that seizure as a guarantee of an opportunity to ask him to further surrender his liberty. There was a minimal factual

nexus between defendant's illegal seizure and his decision to consent."

*Id.* at 631-32 (emphasis omitted); *see also, e.g., State v. Rodgers/Kirkeby,* 347 Or 610, 629, 227 P3d 695 (2010) (the defendants "ha[d] shown the required [factual] nexus" by showing that they consented during unlawful detentions); *State v. Kolb,* 251 Or App 303, 315, 283 P3d 423 (2012) (same); *State v. Tyler,* 218 Or App 105, 112, 178 P3d 282 (2008) (there was a factual nexus between the officer's illegal stop of the defendant and the defendant's consent where, but for the stop, "the officer would not have had the opportunity to seek consent").

Here, defendant established the required minimal factual nexus between the officers' trespass into his backyard and his consent. The trespass gave the officers the opportunity to obtain defendant's consent. In addition, the trespass was ongoing when the officers obtained defendant's consent to enter his house; the officers were standing, illegally, at the back of defendant's house when they obtained his consent to enter. That is, they were violating his rights when they asked if he would waive them. Indeed, he was facing a trespass by the very persons he would call to report a trespass.

The state does not argue that defendant's consent was independent of or only tenuously related to the officers' trespass. Instead, the state focuses on the connection between the officers' trespass and their decision to request consent. Specifically, the state argues that, even if the officers' entry into defendant's backyard violated defendant's Article I, section 9, rights, the officers did not exploit that violation. The state asserts:

> "The officers' entry onto the curtilage and approach of the back door gave them the opportunity to ask for consent—but it did not provide them a reason to ask for consent. They already had planned to make the request, and nothing they saw before they contacted defendant had any bearing on their pre-existing intent to ask for consent. Thus, they did not exploit any illegality in asking for consent[.]"

The Supreme Court rejected the same argument—that suppression is required only if unlawful police conduct allows the discovery of evidence that led to a request for consent—in *Hall*. The court explained that

> "[a] causal connection requiring suppression may exist because the police sought the defendant's consent solely as the result of knowledge of inculpatory evidence obtained from unlawful police conduct. A causal connection requiring suppression also may exist because the unlawful police conduct, even if not overcoming the defendant's free will, significantly affected the defendant's decision to consent."

339 Or at 35.

Similarly, in *Ayles*, the Supreme Court rejected the state's argument that an officer's illegal detention of the defendant did not taint the defendant's subsequent consent to a search because the officer did not discover any evidence during the detention that prompted his request for consent. 348 Or at 630-31. The state argued that "there was evidence in the record that [the officer] would have asked [the] defendant for consent to search him even if [the officer] had not [illegally stopped the defendant by] ask[ing him] for identification." *Id.* at 630. According to the court, the state's focus was misdirected. As the court explained,

> "*Hall* requires the defendant to establish a 'minimal factual nexus between unlawful police conduct *and the defendant's consent*,' not the police officer's request for consent. That is, the focus of the factual nexus determination is not on whether [the officer's] decision to ask [the] defendant for consent was caused by his taking of [the] defendant's identification; rather, it is on whether [the] defendant would have consented to the search that uncovered the evidence if the officer had not unlawfully seized him."

348 Or at 630-31 (emphasis in original).

Thus, in this case, as in *Hall* and *Ayles*, the state's argument that the officer's trespass did not taint the defendant's consent, because the officers did not discover anything as a result of their illegal conduct that prompted them to request defendant's consent and would have sought his consent regardless, is unavailing. Indeed, if the state's argument were correct, officers could break into an

individual's home, sit inside and wait for the defendant to return home, and then ask the defendant for consent to search the home. Applying the state's proposed rule, the officer's illegal conduct would not taint the defendant's consent.

In sum, the officers violated defendant's constitutional rights by trespassing on his property, and that violation tainted his subsequent consent to the officers' entry into and search of his house. As a result, all evidence obtained as a result of the entry and search should have been suppressed.

Reversed and remanded.